UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
CORE-MARK MIDCONTINENT, INC.,

                         Plaintiff,

        -against-

**REPORT AND
RECOMMENDATION**
14-CV-3694-SJ-SJB

TRI-STATE CANDY WHOLESALE, INC.,
KIRTIKUMAR S. VED *a/k/a* VED
KIRTIKUMAR *a/k/a* KIRTI S. VED
*a/k/a* KIRDI KUMAR,

                      Defendants.
-----------------------------------------------------------------X

**BULSARA, United States Magistrate Judge:**

Plaintiff Core-Mark Midcontinent, Inc. ("Core-Mark") brought this breach of
contract action against Defendants Tri-State Candy Wholesale, Inc. ("Tri-State") and
Kirtikumar S. Ved, also known as Ved Kirtikumar, Kirti S. Ved and Kirdi Kumar ("Ved")
(collectively "Defendants) on June 11, 2014.[1]

The dispute centers around an agreement pursuant to which Core-Mark would
provide Tri-State large quantities of cigarettes and other items regularly sold at
convenience stores.  Tri-State purchased these items on credit, and after accumulating a
significant outstanding balance, stopped making payments.  Core-Mark brought this
action to recover payment, interest and other penalties.  Tri-State does not deny that it
received items and failed to pay for them; instead, Tri-State alleges that Core-Mark
offered rebates to Tri-State on cigarettes, in violation of New York's Cigarette Marketing

---

[1] Core-Mark also refers to Ved as "Kurdi Ved" in its 56.1 statement.  (Plaintiff's
Local Rule 56.1 First Statement of Material Facts, Dkt. No. 63 ("Core-Mark Rule 56.1
Stmt.") ¶ 5).  Defendants dispute that Ved was ever known by the name "Kurdi."
(Defendants' Counterstatement in Response to Local Rule 56.1 Statement by Plaintiff,
Dkt. No. 65 ("Tri-State Rule 56.1 Resp.") ¶ 5).

Standards Act ("the CSMA"), N.Y. Tax Law § 483 *et seq.* As a result, Tri-State contends that its contract with Core-Mark is an illegal one that cannot be enforced.

On August 8, 2017, Core-Mark filed a motion for summary judgment on its claims and Defendants' counterclaims. On June 28, 2018, the motion was referred by the Honorable Sterling Johnson to the undersigned for a report and recommendation. For the reasons stated below, it is respectfully recommended that the motion be granted in part and denied in part.

<u>Legal Standard for Summary Judgment Motion</u>

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see generally Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "A genuine issue of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 113-14 (2d Cir. 2017) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

The moving party bears the burden of "demonstrat[ing] the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" in one of two ways. Fed. R. Civ. P. 56(c)(1). It may cite to portions of the record "including depositions, documents, electronically stored information, affidavits or declarations," "admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). Alternatively, it may show that "the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B); *see generally Farid v. Smith*, 850 F.2d 917, 924 (2d Cir. 1988). "In

determining whether summary judgment is appropriate, [the Court] must resolve all ambiguities and draw all reasonable inferences against the moving party." *Tolbert v. Smith*, 790 F.3d 427, 434 (2d Cir. 2015) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

When filing a summary judgment motion, litigants in this District are required to provide a statement setting forth purported undisputed facts or if controverting any fact, responding to each assertion. "The purpose of Local Rule 56.1 is to streamline the consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records without guidance from the parties." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001). Each party must support its position by citing to admissible evidence from the record. *See* Local Rule 56.1(b), (d); *see also* Fed. R. Civ. P. 56(c) (requiring reliance on admissible evidence in the record in supporting or controverting a purported material fact). A "Rule 56.1 statement is not itself a vehicle for making factual assertions that are otherwise unsupported in the record. Where . . . the record does not support the assertions in a Local Rule 56.1 statement, those assertions should be disregarded and the record reviewed independently." *Holtz*, 258 F.3d at 74.

Where the non-moving party fails to specifically controvert a numbered paragraph in the Rule 56.1 statement, the statement by the moving party "will be deemed to be admitted." Local Rule 56.1(c). Alternatively, "the Court will consider the sources for the claims made in dueling Rule 56.1 Statements when they are disputed, rather than rely on the Rule 56.1 Statements themselves[.]" *Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, 138 F. Supp. 3d 352, 396 (S.D.N.Y. 2015). In evaluating the sources of claims made in dueling Rule 56.1 statements, the Court

cannot—as is true for the summary judgment motion as a whole—weigh evidence or assess the credibility of witnesses. *United States v. Rem*, 38 F.3d 634, 644 (2d Cir. 1994).

Facts

Unless otherwise noted, the following facts are beyond dispute and are based on the parties' 56.1 statements, the depositions, declarations, exhibits, pleadings and other evidence submitted:

A. The Parties

Core-Mark is an Arkansas corporation that operates across the United States; its "Pennsylvania Division" is located at 100 West End Road Wilkes-Barre, Pennsylvania 18703. (Core-Mark Rule 56.1 Stmt. ¶ 2; Tri-State Rule 56.1 Resp. ¶ 2). Core-Mark is an authorized dealer and wholesaler of tobacco products, candy, confections, snacks, toiletries, and other "convenience-store" type products, and is engaged in the sale and distribution of such products in New York State. (*Id.* ¶ 3; Core-Mark Rule 56.1 Stmt. ¶ 3).

Tri-State is a New York corporation with its principal place of business at 54-36 48th Street Maspeth, New York 11378. (*Id.* ¶ 4; Tri-State Rule 56.1 Resp. ¶ 4). Tri-State regularly engages in the purchase, sale, and distribution of convenience-store type products. (*Id.* ¶ 8; Core-Mark Rule 56.1 Stmt. ¶ 8). In grocery industry parlance Tri-State is a "distributor" or "sub-jobber." (*Id.* ¶ 6; Tri-State Rule 56.1 Resp. ¶ 6).

Ved is a resident of New York and resides at 28 Center Drive Roslyn, New York 11576. (*Id.* ¶ 5; Core-Mark Rule 56.1 Stmt. ¶ 5). Ved is the President and 100% owner of Tri-State. (*Id.* ¶ 7; Tri-State Rule 56.1 Resp. ¶ 7; *see also* Requests for Admission to

Defendants, attached as Ex. F to Motion for Summary Judgment by Core-Mark Midcontinent, Inc. ("Mot."), Dkt. No. 72 ("Requests for Admission") ¶ 7).[2]

B. The Agreements Between the Parties

In early 2009, Core-Mark sales representative Christopher McDonald ("McDonald") met with Ved to discuss the possibility of Ved becoming a Core-Mark customer. (Deposition of Kirti Kumar Ved, attached as Ex. G to Mot. ("Ved Dep.") at 28:16-29:9). On February 6, 2009, Ved, on behalf of Tri-State, executed two Core-Mark credit applications. (Core-Mark Rule 56.1 Stmt. ¶ 9; Tri-State Rule 56.1 Resp. ¶ 9). The applications were approved; two accounts were established to permit Tri-State to purchase products from Core-Mark on credit. (*Id.* ¶ 11; Core-Mark Rule 56.1 Stmt. ¶ 11).[3] Core-Mark's breach of contract claim is based on these applications. (*Id.* ¶ 10; Compl. ¶ 11).

According to Core-Mark, the credit applications set forth the complete terms of the business relationship between Core-Mark and Tri-State. (Core-Mark Rule 56.1 Stmt. ¶ 9). Ved's signature appears on the credit applications. (Core-Mark

---

[2] Fed. R. Civ. P. 36(a) provides that "[a] party may serve on any other party a written request to admit . . . the truth of any matters within the scope of Rule 26(b)(1) relating to facts, the application of law to fact, or opinions about either; and the genuineness of any described documents." The Rule further provides that "[a] matter is admitted unless, within 30 days after being served, the party to whom the request is directed serves on the requesting party a written answer or objection addressed to the matter and signed by the party or its attorney." These Requests for Admission were served on by Core-Mark on March 16, 2015. Tri-State failed to respond. As a result, Tri-State is deemed to have admitted the Requests for Admission. *See, e.g.*, *S.E.C. v. Dynasty Fund, Ltd.*, 121 F. App'x 410, 411 (2d Cir. 2005) (affirming grant of summary judgment).

[3] One account was for New York State products and the other was for New York City products; separate state and city requirements regarding the taxation of tobacco products necessitated separate accounts. (Core-Mark Rule 56.1 Stmt. ¶ 9; Tri-State Rule 56.1 Resp. ¶ 9; Ved Dep. at 44:5-11).

International, Inc. Credit Application, attached as Ex. A to Affidavit of Stacie Lewis in Support of Plaintiff's Motion for Summary Judgment ("Lewis Aff."), Dkt. No. 72 ("State Credit Application") at 2; Core-Mark International, Inc. Credit Application, attached as Ex. B to Lewis Aff. ("City Credit Application") at 2). Ved admits signing the credit application that was for the New York State account, (Ved Dep. at 41:11-21; Requests for Admission ¶¶ 6, 8), and the New York City account, (Requests for Admission ¶¶ 9, 10). Tri-State and Ved concede that an agreement was reached, but contend that these credit applications did not set forth the complete terms of the commercial relationship between the parties. (Ved Dep. at 39:5-20 (Q: "Did you come to an agreement when you first started to purchase products from Core-Mark[?]" A: "Yes."); Tri-State Rule 56.1 Resp. ¶ 10).

Core-Mark and Tri-State agreed that Tri-State could purchase Products on 14 days credit, *i.e.* Tri-State had to pay Core-Mark within 14 days of the date of the order. (Core-Mark Rule 56.1 Stmt. ¶ 12; Tri-State Rule 56.1 Resp. ¶ 12). They later agreed that purchases could be made on 21 days credit. (*Id.* ¶ 13; Core-Mark Rule 56.1 Stmt. ¶ 13).

But the parties disagree about other terms of agreement. Core-Mark alleges that the credit agreements required that all unpaid debt be subject to service and interest charges at a rate of 1.5% per month. In addition, Core-Mark alleges that Tri-State agreed to "pay all Court costs and attorney fees" incurred by Core-Mark if collection on any unpaid balance became necessary. (Core-Mark Rule 56.1 Stmt. ¶ 14). The applications do provide that Tri-State agrees to a "service charge of 1 1/2% percent on all past due amounts, plus all collection cost's and attorney's fees." (State Credit Application at 2; City Credit Application at 2). Defendants contend they did not agree to a contract with such terms. (Tri-State Rule 56.1 Resp. ¶ 14). However, the two credit

applications submitted by Core-Mark bear signatures of Ved on behalf of Tri-State; the basis for Defendants' dispute about these terms is that Ved did not remember signing the credit applications. (Ved Dep. at 41:22-43:7 (Q: "When do you recall signing these documents, this document?" A: "No, I don't remember."); 50:2-50:5 (Q: "You had never signed a contract before?" A: "No."). Core-Mark's sales representative confirms that Ved signed the credit applications. (Deposition of Christopher McDonald, attached as Ex. L to Mot., ("McDonald Dep.") at 19:2-5; 19:22-20:2).

Defendants contend that Core-Mark agreed to give Tri-State a 2% rebate on products purchased. Ved states that at an initial meeting Core-Mark's salesperson offered Tri-State cash discounts on cigarette purchases. (Declaration of Kirtikumar S. Ved in Support of Defendants' Opposition to Plaintiff's Motion for Summary Judgment, Dkt. No. 73 ("Ved Decl.") ¶ 4). At a subsequent meeting, Core-Mark representatives "confirm[ed] their offer to Tri-State" of a 2% discount on the sale of its products. (Id. ¶ 6). Ved made similar assertions in his deposition testimony. (Ved Dep. at 211:10-212:22 (Q: "During this meeting you're telling me that Joe and Chris said to you that Core-Mark would give a discount?" A: "Yes." Q: "Did they specify what the discount was?" A: "Two percent discount." Q: "Two percent of every single invoice?" A: "Every single invoice, invoice amount." Q: "You said that the discount was given for the rebate was given sometimes?" A: "Yes, sir." . . . Q: "How much in rebates did Core-Mark give to Tri-State over its relationship?" A: "I don't have that figure with me." Q: "Was it more than $100,000?" A: "$200,000 around.").

Ved submitted check stubs and invoices that he alleges reflect the rebate. The handwritten check stubs purportedly correspond to the amounts listed on corresponding invoices, and Ved states that the checks were never cashed by Core-Mark.

(Ved Decl. ¶ 12 ("Most notably, Tri-State issued checks to Core-Mark that corresponded with specific invoices for large purchases of cigarettes, and on many occasions at my request Mr. Farruggio informed me that those checks were either being returned to Tri-State, or simply never presented for payment, in order to provide Tri-State with the cash discounts promised to us.").  Specifically, Ved attaches:

- Check #10949 dated March 31, 2011, (Check stub, attached as Ex. 1 to Ved Decl.), which was a partial payment for Core-Mark Invoice 615551, but was not deposited, (Ved Decl. ¶¶ 16-20);

- Check #11460 and 11461 dated November 21, 2011 and November 22, 2011 respectively, (Check stubs, attached as Ex. 3 to Ved Decl.), which were payments for Core-Mark Invoices 295717 and 295718, but were returned to Tri-State, (Ved Decl. ¶¶ 21-26);

- Check #12284 dated April 25, 2012, (Check stub, attached as Ex. 6 to Ved Decl.), which was payment for Core-Mark Invoices 955652, 955654, 955655, 955688, but was never cashed, (Ved Decl. ¶¶ 27-34);

- Check #12738 dated September 28, 2012, (Torn Check and Check stub, attached as Ex. 8 to Ved Decl.), which was a replacement for another check, but was never cashed, (Ved Decl. ¶¶ 35-43);

- Check #13717, (Torn Check and Check stub, attached as Ex. 10 to Ved Decl.), which was payment for Core-Mark Invoice 986151, but was never cashed, (Ved Decl. ¶¶ 44-49); and

- Check #14734 dated February 9, 2014, (Check stub, attached as Ex. 11 to Ved Decl.), which was partial payment for Core-Mark Invoice 35674, but was never cashed, (Ved Decl. ¶¶ 50-53).

Ashok Sheth ("Sheth"), a certified public accountant ("CPA") and "consultant" to Tri-State, submitted a declaration supporting Ved's testimony and declaration. According to Sheth, he learned about the existence of the rebate from other Tri-State employees, and saw documentary evidence, including invoices and checks, demonstrating that rebates were provided by Core-Mark. (Declaration of Ashok Sheth in Support of Defendants' Opposition to Plaintiff's Motion for Summary Judgment, Dkt. No. 73 ("Sheth Decl.") ¶ 6 ("Most notably, Tri-State would issue checks to Core-Mark that corresponded with specific invoices for large purchases of cigarettes, and on many occasions those checks would either be returned to Tri-State, or simply never presented for payment, in order to provide Tri-State with the cash discounts promised to them."); ¶ 30 ("I believed and continue to believe that this reflects the cash discounts that Core-Mark promised and gave to Tri-State.")). Sheth also refers to the check stubs submitted by Ved and attests that the checks were never deposited and reflect a rebate from Core-Mark. (Sheth Decl. ¶¶ 11-48).

Paresh Kapadia ("Kapadia"), a Tri-State employee, testified that he saw Core-Mark drivers provide Ved an envelope with checks that contained rebates. (Deposition of Paresh Kapadia, attached as Ex. H to Mot. ("Kapadia Dep.) at 79:20-81:12 (Q: "Did you ever see Core-Mark give the two percent to Mr. Ved?" A: "Sometimes the driver used to bring in an envelope checks and he used to give Mr. Ved. I mean, give it to us and we used to give it to Mr. Ved. It was in a sealed envelope."); 82:9-14; 84:12-23).

Core-Mark's own documents suggest that Core-Mark used rebates or concessions as part of its business. For instance, Core-Mark's 2016 and 2012 annual reports indicate that sales incentives or discounts were provided to customers. (2016 Annual Report, attached as Ex. B to Declaration of Christina M. Corcoran in Support of Defendants'

Opposition to Plaintiff's Motion for Summary Judgment ("Corcoran Decl.), Dkt. No. 73 at 49; 2012 Annual Report, attached as Ex. C to Corcoran Decl. at 39, 53).

Core-Mark disputes that any rebate was provided. (Reply Memorandum of Law in Further Support of Plaintiff Core-Mark Midcontinent Inc.'s Motion for Summary Judgment, Dkt. No. 74 ("Core-Mark Reply") at 33). Core-Mark's employees testified that the company does not offer rebates in New York state on cigarette sales. (Deposition of Stacie Lewis, attached as Ex. I to Mot. ("Lewis Dep.") at 17:21-18:18 (Q: "How about at Core-Mark? Have your ever heard of [rebates] occurring?" A: "No."); Deposition of Joseph Farruggio, attached as Ex. J to Mot. ("Farruggio Dep.") at 43:11-13 (Q: "Have you ever offered a rebate to any customer in New York State?" A: "No."); Deposition of Frank Orloski, attached as Ex. K to Mot. ("Orloski Dep.") at 17:17-20 (Q: "What are the sales reps who are dealing with customers in New York told to do when a customer asks for a rebate?" A: "There is no rebating."); McDonald Dep. at 40:15-41:1 (Q: "Is it your understanding that customers potential customers that you are trying to sign ask for rebates on cigarettes? . . . And did it happen with Mr. Ved?" A: "I don't remember. It could have. He could have asked. And the answer would have been, no.")).

The bottom of the credit applications each contain a "Guarantee of Payment" paragraph, where Ved agreed to be responsible for nonpayment by the Tri-State. (Core-Mark Rule 56.1 Stmt. ¶ 15; Tri-State Rule 56.1 Resp. ¶ 15; State Credit Application at 2; City Credit Application at 2). Both Guarantees of Payment bear Ved's signatures, (*id.*), and Ved admitted that it was his signature on both documents. (Amended Answer, Dkt. No. 38 ("Am. Answer") ¶¶ 46, 62; Requests for Admission ¶¶ 8, 10).

C. <u>Delivery and Non-Payment of Goods</u>

Beginning in February 2009, Tri-State ordered products from Core-Mark on a regular basis, and Core-Mark delivered the products ordered. (Core-Mark Rule 56.1 Stmt. ¶ 16). In total, Tri-State ordered $33,051,039.75 of products from Core-Mark. (Lewis Aff. ¶ 25).

According to Stacie Lewis, controller for the Pennsylvania division of Core-Mark, Core-Mark generated an invoice and a "load list" whenever products were ordered. (*Id.* ¶¶ 13, 14). At delivery, Core-Mark provided Tri-State a copy of the invoice and load list. The invoice set forth the customer's name, address, a description of the products in the order, the quantity and price of each item. (*Id.* ¶ 15). The load list set forth information about the delivery, including the date and time of the delivery, description of the items, and the amount of money to be collected by the Core-Mark driver. (*Id.* ¶ 13). On each load list is a customer signature line. (*Id.*) Core-Mark submitted load lists bearing the signature of an employee, officer, representative or agent of Tri-State, (Requests for Admission ¶ 1; Load List, attached as Ex. C to Lewis Aff.), and thereby indicate that Tri-State accepted the products listed. (Requests for Admission ¶ 2). Defendants dispute that Core-Mark always delivered products listed, and the products were sometimes defective. (Tri-State Rule 56.1 Resp. ¶¶ 16, 17).[4] Core-Mark submitted invoices, in connection with its summary judgment motion, that reflected Tri-State's product orders

---

[4] Tri-State cites to the deposition of Frank Orloski, president of the Pennsylvania division of Core-Mark, to suggest Core-Mark failed to deliver products or the products were sometimes defective. The cited portions of the testimony do not support Tri-State's account. Separately, Defendants identified 8 invoices during discovery, which they proffer as evidence that Core-Mark failed to deliver or provided defective products. Core-Mark's system only reflects defective products that were returned for one of these invoices; and Core-Mark provided a credit to Tri-State's account as a result. (Lewis Decl. ¶¶ 51-55).

and any credits given by Core-Mark; Tri-State admitted that each of these invoices was accurate.  (Requests for Admission ¶ 4).

Tri-State made some payments to Core-Mark, but failed to make all of the payments due.  At times, Tri-State simply failed to pay all or part of the amount due. (Lewis Aff. ¶ 26).  In addition, many checks Tri-State tendered to Core-Mark were returned because Tri-State's bank account had insufficient funds, or Defendants stopped payment on the check.  (Core-Mark Rule 56.1 Stmt. ¶ 19; Tri-State Rule 56.1 Resp. ¶ 19 (disputing whether any agreement is enforceable, but not the fact that payments were not made)).

As a result, Core-Mark stopped delivering products to Tri-State on May 14, 2014. (*Id.* ¶ 20; Core-Mark Rule 56.1 Stmt. ¶ 20).  From May 14, 2014 onwards, Defendants stopped payment on at least 6 checks payable to Core-Mark.  (*Id.* ¶ 21; Tri-State Rule 56.1 Resp. ¶ 21; Requests for Admission ¶ 15).  Core-Mark made several demands to Tri-State and Ved to make good on these bounced checks.  (Core-Mark Rule 56.1 Stmt. ¶ 22; Tri-State Rule 56.1 Resp. ¶ 22 (contesting only to the extent of whether a formal demand was made)).  Ved confirmed that Defendants owe Core-Mark money.  (Ved Dep. at 133:19-21 (Q: "Did you believe at the time of this letter that you owed Core-Mark money?"  A: "Yes.")).

In total, by June 2014, Tri-State owed $2,770,850.55 for products ordered but not paid for.  (Lewis Aff. ¶ 32).  This number is the result of the accounting ordered by the Court.  At the initial conference on August 7, 2014, the Honorable Steven M. Gold directed Core-Mark to "provide a full accounting of the amounts they claim are owed by October 6," and Tri-State to "provide comments by November 1."  (Minute Entry dated August 8, 2014, Dkt. No. 10).  To calculate the amount due, Core-Mark reviewed all of

the invoices for products ordered by Tri-State in Core-Mark's electronic accounting system and in hard copy. (Lewis Aff. ¶ 40). That amount was reduced by payments made by Tri-State, any credits given by Core-Mark to Tri-State (for damaged products or products that may not have been ordered or included by mistake), not including any bounced checks and stopped payments. (*Id.*)

Ved acknowledged that Defendants owe Core-Mark over $1.5 million, but he believes he should only pay $1.5 million. (Ved. Dep. at 133:22-134:7 (Q: "How much do you believe you owed Core-Mark as of May 22, 2014?" A: "$1.5 million." Q: "How did you know that?" A: "I don't have the calculation, but my mind says I owe $1.5 million."); 189:16-24 (Q: "Do you know what the total debt owed to Core-Mark was on August 27, 2013?" A: "Not really." Q: "Did Tri-State owe at least $1.5 million to Core-Mark at that time?" A: "Yes, sir." Q: "But you used the words, I will be reducing total amount 1.5. So, do you know if the debt was more than 1.5?" A: "Yeah, more than 1.5. So that is why I am telling I will reduce to 1.5."). Defendants also admitted that the documents reviewed by Core-Mark accurately reflect the amount due for the products ordered by Tri-State. (Requests for Admission ¶¶ 3-5).

D.    The Security Interest Agreement

On February 6, 2009 along with the credit applications the parties executed a security agreement (the "Security Interest Agreement"). This contract granted Core-Mark a security interest in the products and the other property of Tri-State in the event of non-payment. (Core-Mark Rule 56.1 Stmt. ¶ 26). Core-Mark did not submit the Security Interest Agreement in connection with its summary judgment motion. Tri-State contends that Ved's signature on the Security Interest Agreement was forged, and that Core-Mark lacks a security interest in Tri-State's assets. (Am. Answer ¶¶ 68, 72).

To perfect its security interest, Core-Mark filed a Uniform Commercial Code ("UCC") Financing Statement (Form UCC-1) with the New York State Secretary of State on February 13, 2011 that it subsequently renewed. (Core-Mark Rule 56.1 Stmt. ¶ 27; Ved Dep. at 150:22-24 ("They says Core-Mark has and bank has an UCC, so we cannot go further in process.")). When shown a copy of the Security Interest Agreement that purported to bear his signature, Ved stated he had never seen the document and the document did not bear his signature or handwriting. (Ved. Dep. at 59:11-60:8). He did not know who had signed the agreement on behalf of "Tri-State Candy Wholesale Inc." (*Id.*)

In 2014, Tri-State applied for significant loans from financial institutions in order to assist it in paying off its debts to creditors. (Core-Mark Rule 56.1 Stmt. ¶ 28; Tri-State Rule 56.1 Resp. ¶ 28). Among others, Ved applied for a loan or to refinance an existing loan with Habib American Bank that was denied. (Requests for Admission ¶¶ 11-14). The Loan Applications were denied because the financial institutions determined Tri-State was a credit risk. (Core-Mark Rule 56.1 Stmt. ¶ 30; *see also* Ved Dep. at 159:4-6 (Q: "But [Bank of India] had a concern that you had a lot of debt?" A: "Yes.")).

E.    The Complaint, Counterclaims, and the Present Motion

Core-Mark filed the Complaint on June 11, 2014. (Compl., Dkt. No. 1). It alleges six causes of action: (1) breach of contract by Tri-State (*id*. ¶¶ 18-33) based on the credit applications, for products ordered by from January 6, 2014 to May 12, 2014 (Count I); (2) account stated against Tri-State for the products that are the basis of the breach of contract claim (*id*. ¶¶ 34-40) (Count II); (3) quantum meruit against Tri-State (*id*. ¶¶ 41-44) (Count III); 4) breach of the guarantee agreement by Ved (*id*. ¶¶ 45-51) (Count IV); (5) violation of New York Uniform Commercial Code ("N.Y. UCC") § 3-403 (*id*. ¶¶ 52-

65) by both Ved and Tri-State for the bounced checks (Count V); (6) violation of the Security Interest Agreement by Ved (*id.* ¶¶ 66-73) (Count VI).

On July 9, 2014, Tri-State filed an answer. (Answer, Dkt. No. 6). Over a year later on July 13, 2015, Tri-State filed an Amended Answer. (Am. Answer, Dkt. No. 38). The Amended Answer makes various factual allegations and also asserts four counterclaims. These counterclaims are based on Ved's contention that the signature on the Security Interest Agreement was forged. (Am. Answer—Counterclaims ¶¶ 11, 14). The counterclaims: (1) seek a declaratory judgment that the UCC-1 Financing Statement filed by Core-Mark is void, because it was based on a forged Security Interest Agreement (*id.* ¶¶ 19-26); (2) seek a judgment directing Core-Mark to file a UCC-3 Termination Statement to terminate its UCC-1 Financing Statement (*id.* ¶¶ 27-29); (3) allege a claim for common law fraud (*id.* ¶¶ 30-35); and (4) seek damages under Article 9 of the N.Y. UCC (*id.* ¶¶ 36-38).

On August 8, 2017, Core-Mark moved for summary judgment, seeking $2,770,850.55, plus interest, attorney's fees, and costs for a total amount of $4,480,755.13. (Memorandum of Law in Support of Core-Mark Midcontinent Inc.'s Motion for Summary Judgment, Dkt. No. 72 ("Core-Mark Br.") at 16). The motion sought summary judgment on each of Core-Mark's claims, except Count VI based on a breach of the Security Interest Agreement. It also seeks dismissal of Tri-State's affirmative defenses and its four counterclaims.

Discussion

## I.  Breach of Contract

Core-Mark's breach of contract claim (Count I) is based on a breach of the credit agreements by Tri-State. (Core-Mark Rule 56.1 Stmt. ¶ 10, 15; Compl. ¶ 11, 17). The

credit agreements state that any dispute "shall be governed in all respects by the laws of the State from which the goods are shipped." (State Credit Application at 2; City Credit Application at 2). The record indicates that the goods were shipped from Pennsylvania. (*See* Lewis Aff. ¶ 13 ("Core-Mark fulfills the order by loading up one of its delivery trucks at its warehouse in Wilkes-Barre (or at one of its 'substation' locations).")). Pennsylvania law would apply based on the credit agreements' choice-of-law provision.

Even where a contract contains a valid choice-of-law provision, the parties may nonetheless consent to the application of New York law once in litigation. *Cargill, Inc. v. Charles Kowsky Res., Inc.*, 949 F.2d 51, 55 (2d Cir. 1991) ("[E]ven when the parties include a choice-of-law clause in their contract, their conduct during litigation may indicate assent to the application of another state's law."); *Walter E. Heller & Co. v. Video Innovations, Inc.*, 730 F.2d 50, 52 (2d Cir. 1984) ("[I]n the absence of a strong countervailing public policy, the parties to litigation may consent by their conduct to the law to be applied."); *see, e.g.*, *Blodgett v. Siemens Indus., Inc.*, No. 13-CV-3194, 2018 WL 385477, at *5 (E.D.N.Y. Jan. 11, 2018) ("Plaintiffs' . . . citation solely to New York law in support of their other claims in their prior submissions is deemed by this Court to constitute an implied consent to use New York law, which settles the choice of law issue in favor of the application of New York law."). The parties exclusively cite New York law, (*see* Core-Mark Br. at 7 (citing elements of breach of contract claim under New York law); Defendants' Memorandum of Law in Opposition to Plaintiff Core-Mark Midcontinent Inc.'s Motion for Summary Judgment, Dkt. No. 73 ("Tri-State Resp.") at 6 (citing New York's CSMA)), and the Court cannot discern any public policy why New York law should not apply. As a result, the Court applies New York law to the claims and counterclaims.

To establish a breach of contract under New York law, a plaintiff must prove: "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004).

Core-Mark contends that the credit applications created a contract, Core-Mark performed the contract by supplying products to Tri-State, Tri-State failed to pay for those products, and this breach resulted in damages to Core-Mark, including the costs of goods, accrued interest and collection fees. (Core-Mark Br. at 7). These basic allegations—supported amply by record evidence—are undisputed. Instead, Tri-State makes a number of arguments why summary judgment on the breach of contract claim is inappropriate. None have merit.

### A. Application of NY's Cigarette Market Standards Act

Tri-State primarily argues that the credit applications are illegal and unenforceable under the CSMA, N.Y. Tax Law § 483 *et seq.*[5]

Illegality is an affirmative defense to a breach of contract claim. If there are issues of material fact as to one or more elements of a non-moving party's affirmative defense, then the moving party's summary judgment motion must be denied. *E.g.*, *BTEC Turbines, LP v. Connecticut Light & Power Co.*, No. 03-CV-1207, 2007 WL 3046257, at *7 (D. Conn. Oct. 17, 2007) ("[B]ecause CL & P has challenged the validity of the Contract as a whole, the Court cannot determine whether CL & P is bound by the limited liability provision until the trier of fact resolves the genuine issues of material

---

[5] Core-Mark argues that Tri-State has waived its affirmative defense of illegality. Core-Mark did not move to strike the Amended Answer. There is no reason to reach the question of whether the defense was waived in light of the failure of the defense on its merits.

fact underlying CL & P's affirmative defenses.").  An affirmative defense does not

preclude summary judgment if the non-moving party has failed to come forward with

evidence on an element of that defense.  *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54-55 (2d

Cir. 1994) ("[I]n cases where there is an absence of evidence to support an essential

element of a defense, with respect to that defense, there can be no genuine issue as to

any material fact since a complete failure of proof concerning an essential element of the

defendant's affirmative defense necessarily renders all other facts immaterial.")

(quotations omitted); *e.g., Mellon Bank, N.A. v. United Bank Corp. of New York*, No.

91-CV-1066, 1993 WL 489679, at *9 (N.D.N.Y. Nov. 18, 1993) ("[T]he court concludes

that defendants have failed to establish the elements of their defense of impossibility.

Accordingly, the court holds that this affirmative defense creates no genuine issue

of material fact and, therefore, does not preclude a grant of summary judgment in

[Plaintiff's] favor."), *rev'd on other grounds,* 31 F.3d 113 (2d Cir. 1994).

  The party asserting that a contract is illegal bears the burden of demonstrating

illegality.  *See Dervan v. Gordian Grp. LLC*, No. 16-CV-1694, 2017 WL 819494, at *8

(S.D.N.Y. Feb. 28, 2017) (collecting cases).  Any contract that "violates a prohibitory

statute or which cannot be performed without violation of that statute is an unlawful

undertaking and is illegal, void, and unenforceable[.]"  *Sirota v. Champion Motor Grp.,*

*Inc.*, 849 N.Y.S.2d 426, 430 (N.Y. Sup. Ct. 2008) (collecting cases).  A contract that is

void—because it is illegal—is not a valid contract.  And no claim for breach of contract

exists for an invalid contract.  *See Carmine v. Murphy*, 285 N.Y. 413, 416 (1941) ("[N]o

right of action can spring out of an illegal contract."); *Parpal Rest., Inc. v. Robert*

*Martin Co.*, 685 N.Y.S.2d 481, 482 (App. Div. 2d Dep't 1999) ("[T]he contract was

illegal, thereby precluding any right of action arising from such an unlawful

undertaking."); *Scotto v. Mei*, 642 N.Y.S.2d 863, 865 (App. Div. 1st Dep't 1996) ("It is black-letter law that a contract entered into in violation of a statute is an unlawful undertaking and such an illegal contract cannot give rise to a viable cause of action[.]"); *see generally* Glen Banks, *New York Contract Law* § 7.2 (2006) ("A party to an unenforceable illegal contract cannot ask a court to help him or her carry out his or her illegal object[.]").

The CMSA "prohibits the sale of cigarettes below cost when the seller intends thereby to harm competition or evade taxes." *City of New York v. Golden Feather Smoke Shop, Inc.*, No. 08-CV-3966, 2009 WL 2612345, at *35 (E.D.N.Y. Aug. 25, 2009) (quotations omitted); *Jetro Cash & Carry Enterprises, Inc. v. State Dep't of Taxation & Fin.*, No. 1300-92, 1992 WL 685194, at *1 (N.Y. Sup. Ct. Aug. 24, 1992) (stating the purpose of the act was "to regulate and control the sales price of cigarettes within the state at the wholesale and retail levels for the purpose of stabilizing the cigarette industry in New York State."). Section 484(c) of the CSMA voids agreements made in violation of the law: "[a]ny contract, expressed or implied, made by any person in violation of any of the provisions of this article is declared to be an illegal and void contract, and no recovery thereon shall be had." N.Y. Tax Law § 484(c).

Tri-State argues that §§ 484(a)(1) and (a)(2) of the CSMA prohibit the agreements between it and Core-Mark. The arguments are meritless.

As for § 484(a)(1), it provides that it shall be unlawful:

> For any agent [or] wholesale dealer . . . with intent to injure competitors or destroy or substantially lessen competition, or with intent to avoid the collection or paying over of such taxes as may be required by law, to advertise, offer to sell, or sell cigarettes at less than cost of such agent [or] wholesale dealer . . . as the case may be.

This provision prohibits parties in the distribution chain from selling cigarettes at "less than cost," if the intention of doing so is to harm competition or avoid cigarette taxes.[6] If a party does sell cigarettes at "less than cost," doing so "shall be prima facie evidence of intent to injure competitors and to destroy or substantially lessen competition, or of intent to avoid the collection or paying over of such taxes as may be required by law." *Id.* § 484(a)(6).

"Cost" is the "basic cost of cigarettes" plus the seller's "cost of doing business." N.Y. Tax Law §§ 483(b)(1)(A), (b)(2)(A), (b)(3)(A). This "basic cost of cigarettes" is "the invoice cost of cigarettes to the agent who purchases from the manufacturer . . . less all trade discounts, except discounts for cash" plus "the full face value of any stamps which may be required by law." *Id.* § 483(a)(1); *Lorillard Tobacco Co. v. Roth*, 99 N.Y.2d 316, 320 (2003).[7] The CSMA defines a presumptive "cost of doing business" based on the number of cigarettes per package. N.Y. Tax Law § 483(b)(1)(B); *see also City of New York v. Milhelm Attea & Bros.*, No. 06-CV-3620, 2012 WL 3579568, at *34 (E.D.N.Y. Aug. 17, 2012).

---

[6] Two parties in the distribution chain—agents and wholesalers—are relevant to this case. An agent is a "State-licensed 'stamping agent[ ],' usually wholesale cigarette dealers, who purchase tax stamps from the State and affix them to cigarette packages as evidence of payment." *Golden Feather Smoke Shop, Inc.*, 2009 WL 2612345, at *4. (citing N.Y. Tax Law § 471 ("The agent shall be liable for the collection and payment of the tax on cigarettes imposed by this article and shall pay the tax to the commissioner by purchasing, under such regulations as he or she shall prescribe, adhesive stamps of such designs and denominations as he or she shall prescribe.")). A "wholesale dealer" is "any person other than an agent who sells cigarettes to retail dealers or other persons for purposes of resale only[.]" *Id.* § 483(a)(2).

[7] The stamps are adhesives that must be affixed to a box of cigarettes before sale; agents pay the requisite cigarette tax when they purchase these stamps from New York State. N.Y. Tax Law § 471.

Defendants have alleged that Core-Mark agreed to give Tri-State a 2% rebate on cigarettes.  (Core-Mark argues it did not).  *Supra* at 7-10.  This 2% rebate, if it existed, is insufficient to establish that the parties' contracts run afoul of the CSMA.  Tri-State has offered no evidence to demonstrate that a 2% rebate resulted in Core-Mark selling cigarettes at "less than cost."  That is, it provides no evidence about the invoice cost of the cigarettes purchased, the value of any trade discounts, the applicable "cost of doing business," or any stamps.  Without that information, it is impossible to conclude that a 2% rebate would result in Core-Mark's cigarettes being sold at "less than cost" in violation of the CSMA.

Tri-State's mistaken premise is that the CSMA bars all discounts or rebates.  Not so.  The CSMA does not bar rebates or discounts outright; it bars them to the extent they push the sale of the cigarettes below the "cost" of the party selling them.  20 N.Y. Comp. Codes R. & Regs. § 84.1 ("A rebate or a concession, in and of itself, is neither unlawful for the purpose of the cigarette marketing standards nor a violation of the Tax Law where such rebate or concession does not directly or indirectly serve to reduce the price below that at which cigarettes can be lawfully sold or purchased in this State.").

As to section 484(a)(2), it makes it illegal for a "wholesale dealer":

(A) to induce or attempt to induce or to procure or attempt to procure the purchase of cigarettes at a price less than the cost of the agent with respect to sales to wholesale dealers; or

(B) to induce or attempt to induce or to procure or attempt to procure any rebate or concession of any kind or nature whatsoever in connection with the purchase of cigarettes.[8]

Subsection (A) prohibits a wholesale dealer from inducing another party to purchase cigarettes at less than "the cost of the agent." Again, Tri-State, having submitted no information about the cost of cigarettes sold to them, cannot establish that Core-Mark's agreement or 2% rebate was an improper inducement that violates this subsection.

As to subsection (B), it prohibits a wholesale dealer from attempting to or obtaining a rebate or other concession for cigarettes. Defendants argue in their papers that Core-Mark "targeted and induced defendant Tri-State . . . to do business with them on substantial cigarette rebates." (Tri-State Resp. at 6). But that cannot be a violation of subsection (B). Subsection (B) prohibits a party from "induc[ing]" or "procur[ing]" a rebate. That would preclude *Core-Mark from obtaining a rebate.* That is, Core-Mark cannot try to receive a rebate in connection with its purchase of cigarettes. But that is not this case. Tri-State was not giving Core-Mark a rebate. Tri-State was not even selling Core-Mark cigarettes. It was the other way around: Tri-State alleges that Core-Mark gave it a rebate, to induce Tri-State to buy from Core-Mark. Subsection (B) does not govern such a rebate. Subsection (B) covers attempts from downstream buyers— who are wholesale dealers—from procuring rebates from upstream sellers. It does not

---

[8] Core-Mark argues that it is not subject to this provision of the CSMA because it is an agent, not a wholesale dealer. It is true that Core-Mark operates as an agent; but it also operates as a wholesale dealer. Acting as the former does not preclude it from liability under provisions governing wholesale dealers, if Core-Mark also acts as a wholesaler. *City of New York v. Golden Feather Smoke Shop, Inc.*, No. 08-CV-3966, 2009 WL 705815, at *14 (E.D.N.Y. Mar. 16, 2009) (in rejecting attempt to avoid application of the CSMA, finding the statute's definitional categories are not mutually exclusive, and parties can play multiple roles simultaneously).

prohibit the upstream seller from offering a rebate. That is the point of subsection (A), which prevents an upstream seller like Core-Mark from engaging in certain acts to induce another party to purchase cigarettes. But that prohibition, as discussed above, requires proof of cigarette costs, something that Tri-State has not provided.

For these reasons, Tri-State's attempts to invalidate the credit applications based on the CSMA are without merit, and provide no basis to avoid summary judgment on the breach of contract claim (Count I).[9]

### B. Scope of the Agreement

In the most cursory fashion, Defendants contend that the questions about the scope of the credit applications preclude summary judgment. (Tri-State Resp. at 17). Defendants argue that Core-Mark's agreement had additional terms not reflected in the credit applications, including the existence of rebates. The argument is misplaced. Core-Mark has sought summary judgment on the basis of the credit applications and the cigarettes sold but not paid for by Defendants. Defendants have not—other than the CSMA argument addressed above—disputed the validity of the credit applications or the guarantee signed by Ved. In fact, Ved at his deposition did not dispute that he owed at least $1.5 million for the cigarettes purchased; what he disputed was the amount being sought in addition to this base amount. (Ved. Dep. at 133:22-134:7 (Q: "How much do

---

[9] The *in pari delicto* defense raised by Defendants is premised on the CSMA argument; the doctrine does not apply if Defendants do not establish that the CSMA renders the credit agreements invalid. It is also why their arguments about § 484(c) do not defeat summary judgment. Section 484(c) states that "[a]ny contract, expressed or implied, made by any person *in violation of any of the provisions of this article* is declared to be an illegal and void contract, and no recovery thereon shall be had." N.Y. Tax Law § 484(c) (emphasis added). Defendants have failed to establish that the agreements in question violate the CSMA, and therefore § 484(c) does not invalidate any contract claim.

you believe you owed Core-Mark as of May 22, 2014?"  A: "$1.5 million."  Q: "How did you know that?"  A: "I don't have the calculation, but my mind says I owe $1.5 million."  Q: "Had you done some sort of calculation at the time that you received this letter?"  A: "No.").  Their arguments that the agreement covered other matters, including rebates, does not defeat liability for the unpaid cigarettes.

At best, Defendants' argument goes to the quantum of damages recoverable for the breach claim.  To establish liability on a breach of contract claim at summary judgment, a party needs to establish that damages were suffered and not speculative.  That is, a plaintiff does not need to provide an exact dollar figure for his damages before trial; the plaintiff need show only that he did in fact suffer some damages.  *See Hess Corp. v. Ball Corp.*, No. 5:10-CV-587, 2012 WL 1454152, at *5 (N.D.N.Y. Apr. 25, 2012) (granting summary judgment as to liability as "it is clear from the record that [plaintiff] was damaged. . . .  The exact amount of damages, however, shall be left for resolution at trial in the event the parties are unable to come to a settlement agreement in that regard.").

Nonetheless, the potential existence of a rebate makes it impossible to grant Core-Mark summary judgment with respect to damages.  If there are rebates not reflected on the submitted invoices, the Court cannot determine—at summary judgment—the precise dollar figure of Core-Mark's damages.  Core-Mark has argued that there is insufficient evidence about the rebate, because Ved's own self-serving statements are the only evidence of any rebate.  (Core-Mark Br. at 19-20).  This argument is incorrect.  Ved is not the only person who attested to the existence of the rebate.  Tri-State's consultant, a CPA, testified that Core-Mark provided a 2% rebate

incentive to buy cigarettes. *Supra* at 9. And both Ved and Sheth refer to the submitted check stubs and invoices they allege support the existence of the rebate. *Supra* at 8-9.

In any event, that Ved's testimony is self-serving is not a basis to discard his testimony and find that there was no rebate. It is only in the "in the rare circumstance where the [nonmovant] relies almost exclusively on his own testimony, much of which is contradictory and incomplete, [that] it will be impossible for a district court to determine . . . whether there are any genuine issues of material fact, without making some assessment of the [nonmovant's] account." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (quotations omitted). That is, in order for a court to discredit a party's self-serving testimony, the testimony must be "so replete with inconsistencies and improbabilities that no reasonable [fact-finder] would undertake the suspension of disbelief necessary to credit the allegations made in his complaint." *Id.* at 555 (quotations omitted); *see also Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 106 (2d Cir. 2011) (assessment of witness credibility should be confined to "certain extraordinary cases, where the facts alleged are so contradictory that doubt is cast upon their plausibility[.]") (quotations omitted). And the Court may only do that if the moving party "meet[s] the difficult burden of demonstrating that there is no evidence in the record upon which a reasonable factfinder could base a verdict in the [nonmovant's] favor." *Jeffreys*, 426 F.3d at 554.

This is not such a case. As noted earlier, Ved's account is corroborated by at least one other person and documentary evidence. Core-Mark has also failed to establish that Ved's claims about a rebate are improbable, or that his deposition testimony and declaration are inconsistent internally or with the other. The Court's review suggests, if anything, that they are consistent. (*Compare* Ved Dep. at 211:14-212:22 (Q: "Did they

specify what the discount was?"  A: "Two percent discount."  Q: "Two percent of every single invoice?"  A: "Every single invoice, invoice amount.") *with* Ved Decl. ¶ 6 ("During that meeting, Messrs. McDonald and Farruggio confirmed their offer to Tri-State of a two percent cash discount or 'commission' on the sales of all products.").

A genuine issue of material fact exists as to whether a 2% rebate is part of the agreement between Core-Mark and Tri-State; therefore, the Court cannot recommend granting summary judgment with respect to damages.  If such a rebate exists, then the amount due to Core-Mark would be reduced.  As Ved testified, *supra* at 7, the rebate was to be applied to "[e]very single invoice."  The current damages calculation provided by Core-Mark does not take into account any rebate.  (*See* Lewis Aff. ¶ 40 (stating that the calculation was reduced only by any credits given by Core-Mark to Tri-State for damaged products or products that may not have been ordered or were included by mistake)).

II.    Other Causes of Action

A.    Breach of Guarantee

To prevail on a claim for a breach of claim of guarantee (Count IV) a plaintiff must prove: "'(1) that it is owed a debt from a third party; (2) that the defendant made a guarantee of payment of the debt; and (3) that the debt has not been paid by either the third party or the defendant.'"  *Es-Tee Realty Co. v. Soumekhian*, 323 F. App'x. 3, 4 (2d Cir. 2008) (quoting *Chemical Bank v. Haseotes*, 13 F.3d 569, 573 (2d Cir. 1994)).  The breach of guarantee claim is alleged only against Ved.

As discussed above, Core-Mark is owed an outstanding debt (the exact amount to be determined depending on whether a 2% rebate exists), and the debt has not yet been paid.  This satisfies the first and third elements.  Regarding the second element, Ved has

admitted that he executed the guarantee located at the end of the both credit agreements and they bear his signature. (Core-Mark Rule 56.1 Stmt. ¶ 15; Tri-State Rule 56.1 Resp. ¶ 15; State Credit Application at 2; City Credit Application at 2). As a result, all three elements of the guarantee claim are satisfied, and Core-Mark is entitled to summary judgment on this claim. *See, e.g.*, *Prof'l Merch. Advance Capital, LLC v. C Care Servs., LLC*, No. 13-CV-6562, 2015 WL 4392081, at *5 (S.D.N.Y. July 15, 2015) ("Here, the guarantee signed by Sobier unconditionally required Sobier to perform C Care's obligations under the Agreement in the event of a breach by C Care. As noted above, Plaintiff fully performed, Defendants failed to make the minimum payments required, and Plaintiff was damaged by this failure."). However, as with the breach of contract claim, because the amount owed is to be determined, the Court cannot recommend granting summary judgment as to damages.

B. Quasi-Contract Claims

Core-Mark has alleged two different claims under quasi or implied contract theories: one for "account stated" (Count II); another for quantum meruit (Count III). *LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham*, 185 F.3d 61, 64 (2d Cir. 1999) (an account stated claim under New York law "may be implied if a party receiving a statement of account keeps it without objecting to it within a reasonable time or if the debtor makes partial payment.") (quotations omitted); *Fashionwear (PVT) Ltd. v. Regatta (U.S.A.) LLC*, No. 03-CIV-5597, 2004 WL 2210258, at *3 (S.D.N.Y. Sept. 30, 2004) (quantum meruit is implied contract theory).

"Quasi-contractual claims are not permitted when a valid and legally enforceable instrument exists to govern the events that arise out of the subject matter." *Cosmocom, Inc. v. Marconi Commc'ns Int'l Ltd.*, 261 F. Supp. 2d 179, 187 (E.D.N.Y. 2003)

(quotations omitted). The account stated and quantum meruit claims are based on the same factual allegations that are the basis of the contract claims (the credit applications and guarantees) under which Core-Mark seeks recovery. Core-Mark may not recover on an implied contract theory when there is an express contract present, and therefore is not entitled to summary judgment on its claims for account stated or quantum meruit. *See Ross Univ. Sch. of Med., Ltd. v. Brooklyn-Queens Health Care, Inc.*, No. 09-CV-1410, 2013 WL 1334271, at \*20 (E.D.N.Y. Mar. 28, 2013) ("[A]lthough a party may plead inconsistent theories of recovery, because a summary judgment motion is the procedural equivalent of a trial . . . a litigant must elect among inconsistent positions upon seeking expedited disposition.") (quotations omitted); *Dessert Beauty, Inc. v. Platinum Funding Corp.*, 519 F. Supp. 2d 410, 422 (S.D.N.Y. 2007) ("Because the parties entered into an express contract with respect to the issues before the Court, quasi-contractual claims, such as money had and received and unjust enrichment, cannot be maintained."); *Lekki Capital Corp. v. Automatic Data Processing, Inc.*, No. 01-CIV-7421, 2002 WL 987147, at \*3 (S.D.N.Y. May 14, 2002) (denying plaintiff's summary judgment motion on quasi-contract claims where court determined that express contract existed); *Primetime 24 Joint Venture v. Echostar Commc'ns Corp.*, No. 98-CIV-6738, 2002 WL 44133, at \*7 (S.D.N.Y. Jan. 11, 2002) ("Since the Court has concluded as a matter of law that, for the period March 1998 through July 19, 1998 (*i.e.* the pre-termination period), Plaintiff is entitled to summary judgment on its breach of contract claim, the quasi-contract claim is dismissed."); *Xuchang Rihetai Human Hair Goods Co. v. Hanyu Int'l USA Inc.*, No. 00-CIV-5585, 2001 WL 883646, at \*5 (S.D.N.Y. Aug. 7, 2001) ("Because there is no dispute that valid contracts govern the parties' obligations to each other, recovery through plaintiff's quasi-contractual causes

of action—for account stated and on the negotiable instruments—is precluded. Accordingly, plaintiff's motion for summary judgment on these claims is denied and in light of the grant of summary judgment on the breach of contract claim, these causes of action are dismissed.").

C. <u>Negotiable Instrument</u>

Core-Mark also seeks summary judgment for the bounced checks under UCC § 3-403 ("Signature by Authorized Representative") (Count V). N.Y. UCC § 3-403 provides as follows:

(1) A signature may be made by an agent or other representative, and his authority to make it may be established as in other cases of representation. No particular form of appointment is necessary to establish such authority.

(2) An authorized representative who signs his own name to an instrument

(a) is personally obligated if the instrument neither names the person represented nor shows that the representative signed in a representative capacity;

(b) except as otherwise established between the immediate parties, is personally obligated if the instrument names the person represented but does not show that the representative signed in a representative capacity, or if the instrument does not name the person represented but does show that the representative signed in a representative capacity.

(3) Except as otherwise established the name of an organization preceded or followed by the name and office of an authorized individual is a signature made in a representative capacity.

The statute imposes liability on a company where an authorized representative signs a negotiable instrument (§ 3-403(1)) and personal liability on an individual who signs such an instrument but fails to indicate that he has signed in his representative capacity only on the instrument (§ 3-403(2)). *Carador v. Sana Travel Service, Ltd.*, 700 F. Supp. 787 (S.D.N.Y. 1988), *aff'd*, 876 F.2d 890 (2d Cir. 1989). "As explained by the New

York Court of Appeals, this rule 'aims to foster certainty and definiteness in the law of commercial paper.'" *Finkel v. Romanowicz*, 577 F.3d 79, 88 (2d Cir. 2009) (quoting *Rotuba Extruders, Inc. v. Ceppos,* 46 N.Y.2d 223, 228 (1978)).

Core-Mark seeks a sum of $609,069.02 based on series of checks written in May and June 2014 that were either returned for insufficient funds or Tri-State cancelled and stopped payment on.  (Core-Mark Br. at 14-15).  Core-Mark attaches 40 checks that were returned for insufficient funds, post-dated, or were cancelled, but fails to identify which of these are the specific checks that total to the amount sought or are the basis of this UCC claim.[10]  (*See* Checks, attached as Ex. G to Lewis Aff.).  Of the attached checks, 27 are signed by Ved and 13 are signed by Kapadia; only 15 are from the relevant time period in May and June 2014 (of those 11 are signed by Ved and 4 by Kapadia).

Without knowing the specific checks that are the basis of Core-Mark's claim, the Court cannot determine whether the checks total to the amount sought.  Even though signing in a representative capacity is an affirmative defense to individual liability under § 3-403(2), *see Finkel,* 577 F.3d at 88, the Court also cannot determine whether liability should be imposed on Ved without knowing the specific checks in question.  Core-Mark seeks to hold Ved jointly and severally liable for the same amount as Tri-State even though Ved is not the signatory to 13 checks submitted.  Core-Mark provides no legal authority to do so.  As noted above, some of the attached checks are not even signed by

---

[10] None of the checks overlap with the checks submitted by Defendants that Defendants claim represent the rebate, *supra* at 8-9.  In addition, the checks are attached as a single exhibit among deposition exhibits, bank notices, and other documents.  Core-Mark's summary judgment motion on this claim does not even cite to them.  It is not the Court's duty to ferret through the voluminous submissions to determine which documents support the relief sought.

Ved, but by Kapadia, who is not a defendant in the case. And thus for some or all checks, liability on Ved would not be appropriate at all.

This evidentiary failure leads to inexorable conclusion that summary judgment on Count V should be denied.

III.   Tri-State's Affirmative Defenses

Core-Mark seeks dismissal of all of Tri-State and Ved's affirmative defenses. (Core-Mark Br. at 17-18). "[I]f a plaintiff also uses a summary judgment motion to challenge the legal sufficiency of an affirmative defense on which the defendant bears the burden of proof at trial, the plaintiff 'may satisfy its Rule 56 burden by showing that there is an absence of evidence to support [an essential element of] the [non-moving party's] case.'" *Cont'l Airlines, Inc. v. Lelakis*, 943 F. Supp. 300, 304 (S.D.N.Y. 1996) (quoting *DiCola v. SwissRe Holding (North America), Inc.*, 996 F.2d 30, 32 (2d Cir. 1993)), *aff'd*, 129 F.3d 113 (2d Cir. 1997). With the exception of the discussion it provides on the CSMA, Core-Mark addresses the affirmative defenses in the most conclusory fashion, without addressing the elements of those defenses, or explaining why summary judgment on each defense is appropriate. Such cursory treatment is insufficient to permit entry of summary judgment on each of the affirmative defenses. *Eurocredit Bank v. Citibank, N.A.*, No. 95-CIV-7713, 1996 WL 556990, at *2 (S.D.N.Y. Oct. 1, 1996) ("[P]laintiff must *show* that defendant has failed to carry its burden of production as to its affirmative defenses.") (emphasis added); *see, e.g., Musica Latina Int'l, Inc. v. Blades*, No. 84-CIV-719, 1984 WL 336, at *4 (S.D.N.Y. May 21, 1984) ("Plaintiff also has made a motion to dismiss all of defendant's affirmative defenses as a matter of law. . . . [P]laintiff in the instant case cites no authority to support his motion.

In the absence of such support or elaboration of plaintiff's reasoning, this court must accept defendant's factual allegations as true at this time.").[11]

The Court does grant summary judgment to Core-Mark, however, on the first and second affirmative defenses which are each based on the CSMA. For the reasons explained above, Tri-State's arguments about the CSMA are meritless or Tri-State has failed to come forward with evidence on one or more elements of the CSMA defense; as such Core-Mark is entitled to summary judgment on these affirmative defenses. Tri-State's third affirmative defense of *in pari delicto* is entirely based upon the CSMA arguments, *supra* at n.9; as a result, Core-Mark is entitled to summary judgment on this affirmative defense as well. Core-Mark's motion to dismiss each of Tri-State and Ved's other affirmative defenses should be denied.

*      *      *

For the reasons discussed above, it is respectfully recommended that summary judgment be granted on Core-Mark's breach of contract claim (Count I) with respect to liability as against Tri-State and on Core-Mark's guarantee claim (Count IV) against Ved, but summary judgment be denied on Core-Mark's account stated, quantum meruit, and UCC § 3-403 claims (Counts II, III, V). Because a genuine issue of material fact exists as to whether a rebate was part of the agreement on the breach of contract and

---

[11] These remaining affirmative defenses do not bar summary judgment with respect to liability on the breach of contract or guarantee claims since Tri-State and Ved failed to assert these defenses in opposition.

guarantee claims, it is further recommended that summary judgment be denied with respect to damages.[12]

IV.    <u>Counterclaims</u>

Core-Mark seeks dismissal of Tri-State's counterclaims. The four counterclaims seek various forms of relief based on Core-Mark's filing of a purportedly fraudulent UCC-1 form, which relied on the Security Interest Agreement, a document Tri-State alleges is fraudulent. Core-Mark's filing of this security interest allegedly caused Tri-State to be denied several loans. Core-Mark's motion is denied. (Core-Mark has failed to move for summary judgment on its own claim for breach of the Security Interest Agreement).

The various bases Core-Mark advances for dismissal of the counterclaims are meritless. Core-Mark first alleges that there is no evidence that the Security Interest Agreement was forged. Core-Mark did not provide the Court this document. (This failure alone is sufficient to deny the motion because Core-Mark failed to meet its burden on summary judgment). As a result, the Court has nothing to suggest that Ved's statement—(Ved Decl. ¶¶ 11-12 ("Upon receipt of the Security Agreement, Ved determined that the signature contained therein was not his signature. The name printed on the Security Agreement is 'Ved Kurtikumar,' which is not his name, the signature is not his signature and the date printed thereon is '2/6/9,' which is not consistent with how he would print the date. Ved's signature on the Security Agreement was forged."))—that the agreement was forged should not be credited on summary

---

[12] Core-Mark seeks and the credit applications entitle Core-Mark to "collection costs and attorney's fees." (State Credit Application at 2; City Credit Application at 2). However, given the recommendation to deny summary judgment with respect to damages, it is also appropriate to defer a determination on attorney's fees and costs.

judgment. As discussed earlier, Ved's statements, even if self-serving, are sufficient to defeat summary judgment, unless they are virtually impossible to believe. *Supra* at 24-26. Without the Security Interest Agreement itself, the Court has no means to draw such a conclusion.

Core-Mark then argues that Ved failed to demonstrate that he suffered any damages as a result of the UCC-1 filing. Again, Core-Mark ignores the record evidence; for example, Ved testified that the UCC-1 filing led at least one bank to reject a loan application. (Ved. Dep. at 150:10-24 (Q: "Did you ever receive an approval?" A. "No." Q: "Did they ever tell you why, 'they' meaning the bank, Bank of India?" A: "Yeah, they had a question about UCC." Q: "What UCC?" A: "UCC, what UCC means you are asking?" Q: "You said they had a question about a UCC. What are you referring to?" A: "They says Core-Mark has and bank has an UCC, so we cannot go further in process.")).[13]

At bottom, with respect to the counterclaims, Core-Mark has offered conclusory arguments that do not cite any legal authorities and ignores the evidence in the record that establish the existence of factual disputes that cannot be resolved on summary judgment.[14]

---

[13] Core-Mark does not explain, among other things, why the fact that Ved's loan was not intended to expand Tri-State, but for other businesses, warrants dismissal of any counterclaim.

[14] Core-Mark suggests that even if the counterclaims are not dismissed, judgment on its claims should be entered promptly. In light of the recommendation that summary judgment on damages be denied, there is no basis on which to enter judgment for Core-Mark at this time.

<u>Conclusion</u>

For the reasons stated above, it is respectfully recommended that the motion for summary judgment be:

1. granted with respect to liability on Core-Mark's breach of contract (Count I) and breach of guarantee (Count IV) claims;

2. denied with respect to damages on those two claims;

3. denied with respect to Core-Mark's account stated (Count II), quantum meruit (Count III), and UCC negotiable instrument (Count V) claims;

4. granted on Tri-State's first, second, and third affirmative defenses, and those defenses dismissed;

5. denied with respect to Tri-State's remaining affirmative defenses; and

6. denied with respect to Tri-State's counterclaims.

Any objections to the Report and Recommendation above must be filed with the Clerk of the Court within 14 days of receipt of this report. Failure to file objections within the specified time waives the right to appeal any judgment or order entered by the District Court in reliance on this Report and Recommendation. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2). Failure to file timely objections may waive the right to appeal the District Court's order. *See Caidor v. Onondaga Cnty.*, 517 F.3d 601, 604 (2d Cir. 2008) ("[F]ailure to object timely to a magistrate [judge's] report operates as a waiver of any further judicial review of the magistrate [judge's] decision.").

*/s/ Sanket J. Bulsara* August 31, 2018
SANKET J. BULSARA
United States Magistrate Judge

Brooklyn, New York