Clerk's Office
Filed Date:  3/17/2023

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------x
BRIAN A. SIDMAN, BAS PARKING GROUP
PACIFIC, LLC, BETSY VONN GINN, and
WILLIAM T. HORNER,

                       Plaintiffs,

     -against-

CONCORD ARENA PARKING, LLC, and
ARIEL JACOBOV,

                       Defendants,

----------------------------------------------------------x
ARIEL JACOBOV,

                       Third-Party Plaintiff,

     -against-

PARK 700 PACIFIC, LLC,

                       Third-Party Defendant,

----------------------------------------------------------x

NOT FOR PUBLICATION
**MEMORANDUM & ORDER**
15-cv-7426 (CBA) (SJB)

**AMON, United States District Judge:**

      This long-running case concerns the rights and obligations of various business associates relating to their failed agreement to acquire a parking garage and commercial retail space in Brooklyn, New York.  The central dispute is straightforward: one of the associates eventually believed himself within his rights to abandon the agreement, so he did.  The other partners disagree with that position.  Thus, on December 31, 2015, Plaintiffs Brian A. Sidman ("Sidman"), Betsy Vonn Ginn ("Vonn Ginn"), William T. Horner ("Horner"), and BAS Parking Group Pacific, LLC ("BAS Parking") (collectively, "Plaintiffs") initiated this action against Shaya B. Pacific I, LLC ("Shaya Pacific"), Concord Arena Parking, LLC ("Concord"), Ariel Jacobov ("Jacobov"), Park

700 Pacific LLC ("Park 700 Pacific"), and FCOR, LLC.[1]  (ECF Docket Entry ("D.E.") # 2 ("Orig. Compl.").)   After over four years of litigation, on April 6, 2020, Plaintiffs filed their Third Amended Complaint, (D.E. # 117 ("TAC")), against solely Concord and Jacobov (together, "Defendants").  Jacobov also subsequently filed a Third-Party Complaint, (D.E. # 120), seeking indemnification against Park 700 Pacific.  These are the operative complaints on the present cross-motions for summary judgment, (see D.E. ## 166-186).  For the reasons set forth below, Plaintiffs' motion for partial summary judgment is DENIED and Defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART.

## BACKGROUND

### I.   Factual Background[2]

### A.   The 2013 Contract of Sale between Shaya Pacific and Concord

On June 10, 2013, Concord—an entity owned and operated by Jacobov—entered into an agreement (the "2013 Contract") to acquire two distressed commercial condominium units, Unit 2 and Unit 100 (jointly, the "Units"), in the Newswalk building at 700 Pacific Street, Brooklyn, New York.  (D.E. # 170 ("Defs. 56.1 Stmt.") ¶ 1; D.E. # 176 ("Pls. 56.1 Stmt.") ¶¶ 4-5; see also D.E. # 174 ("Brodsky Decl.") Ex. B ("2013 Contract").)  Unit 2 is a 170-space parking garage (the "Garage Unit"), and Unit 100 is a roughly 850 square-foot retail space (the "Retail Unit").  (Defs. 56.1 Stmt. ¶¶ 2-3.)  Under the 2013 Contract, Concord would purchase the Units from Shaya Pacific, an entity controlled by non-party Jeshayahu Boymelgreen ("Boymelgreen") that was plagued by various litigation and regulatory issues at the time.  (Id. ¶ 4(a); Pls. 56.1 Stmt. ¶ 3.)

---

[1]  This case was assigned to the Honorable Joseph F. Bianco until its reassignment to the undersigned on April 5, 2019.

[2] The facts set forth in this section, taken from the parties' exhibits and Rule 56.1 statements, are undisputed except where otherwise noted.

Non-party First Central Savings Bank ("FCSB") held a lien on the membership units of Shaya Pacific, and Shaya Pacific could not sell or transfer the condominium Units without the consent of FCSB.  (Defs. 56.1 Stmt. ¶ 4(b); Pls. 56.1 Stmt. ¶ 3.)  In addition, another bank held a first mortgage (the "First Mortgage") on the two Units in the principal sum of $2 million.[3]  (Defs. 56.1 Stmt. ¶ 4(c).)  Jacobov had purchased several distressed properties from FCSB in the past, which is how he learned of the opportunity to enter into the 2013 Contract to buy the two distressed Units from Shaya Pacific.  (Pls. 56.1 Stmt. ¶¶ 2, 4.)

Under the 2013 Contract, Concord would purchase the Units from Shaya Pacific for a total of $3.8 million: $2 million would go toward satisfying the first mortgage held by Doral Bank, with the $1.8 million balance going to FCSB in satisfaction of its lien on the Shaya Pacific membership units.  (Id. ¶ 5.)  The following provision governed Concord's ability to assign the 2013 Contract:

> 25. **No Assignment; Binding Effect.**  Purchaser [(Concord)] shall not assign this Contract or any interest herein or right hereunder or part hereof and except with Seller's [(Shaya Pacific's)] prior written consent in each instance, and any attempted assignment in violation hereof shall be null and void, ab initio, and shall be a material default of Purchaser hereunder.  Notwithstanding the foregoing, the Seller will not withhold its consent to an assignment of this Contract prior to Closing provided Purchaser (i) gives Seller and FCSB written notice of Purchaser's intent to assign the Contract not less than ten (10) days prior to Closing, (ii) the entity to which the Purchaser intends to assign its interest is an entity in which Eric Jacobov is a majority or controlling member or shareholder, (iii) Purchaser provides the Seller and FCSB with all limited liability or corporate documentation required by Seller and FCSB to confirm Eric Jacobov's majority or controlling interest therein, and (iv) said assignment does not in any way delay the Closing Date.

(2013 Contract ¶ 25.)  The ultimate effect of this provision was that if Concord proposed an assignment that satisfied the four conditions in the second sentence (i-iv), then Shaya Pacific would permit the assignment.

---

[3] The First Mortgage was originally held by Doral Bank, but around March 2015, Doral Bank failed and the mortgage was transferred to Banco Popular.  (Defs. 56.1 Stmt. ¶ 12.)

B.  The February 2014 New York AG Order

On or about February 27, 2014, before the transaction contemplated in the 2013 Contract had closed, an additional obstacle to the transaction was created.  As part of a separate action against Boymelgreen, the Attorney General ("AG") of the State of New York entered an order (the "AG Order") that restrained Boymelgreen and his "principals, agents and employees . . . from engaging in any act directly or indirectly relating to the offer, purchase, sale, issuance, advertisement, marketing, promotion, distribution, negotiation, exchange or transfer of securities in or from New York State."  (Defs. 56.1 Stmt. ¶ 6(b).)  The AG Order restrained Shaya Pacific from selling or transferring the real estate Units, (id. ¶ 7), meaning that absent some resolution of the AG Order, the transaction contemplated in the 2013 Contract could not close.

C.  The February 2015 Loan Commitment from FCSB to Concord

As of early 2015, the AG Order remained in place and the 2013 Contract still had not closed.  Nonetheless, the parties were proceeding as if they would be able to complete the deal at some point in the future.  At that time, FCSB, Shaya Pacific, and Concord (through Jacobov) agreed to a loan commitment (the "2015 Loan Commitment"), through which FCSB would finance Concord's acquisition of the two Units at an increased purchase price of $4,325,000.  (Id. ¶ 10; Pls. 56.1 Stmt. ¶ 9; see also D.E. # 175 ("Sidman Decl.") Ex. A ("2015 Loan Commitment").)  The 2015 Loan Commitment contemplated $3,675,000 in loans to be collateralized by the two Units, and left $650,000 as the amount that Concord would need to come up with in cash at closing.  (Pls. 56.1 Stmt. ¶ 9.)  Concord was required to obtain FCSB's permission if it ever sought to assign the 2015 Loan Commitment.  (Defs. 56.1 Stmt. ¶ 11.)

D.  The May 2015 Park 700 Pacific Operating Agreement

Around the same time in early 2015, Plaintiffs entered the picture.  Jacobov and Plaintiff Sidman began discussions to form a joint venture through which investors would help raise the $650,000 cash balance that Jacobov would need to close on the 2013 Contract.  (Pls. 56.1 Stmt. ¶ 10.)  On May 8, 2015, an Operating Agreement (the "OA") was signed by Defendant Jacobov and Plaintiffs Vonn Ginn, Horner, Sidman, and BAS Parking (through Sidman, the owner of BAS Parking) establishing the entity Park 700 Pacific.  (Id. ¶ 12; Defs. 56.1 Stmt. ¶ 13; see Sidman Decl. Ex. B ("OA").)  Park 700 Pacific consists of four members—Jacobov, Vonn Ginn, Horner, and BAS Parking (collectively, the "Members")—and two managers—Jacobov and Sidman (collectively, the "Managers").  (Defs. 56.1 Stmt. ¶¶ 14-15; Pls. 56.1 Stmt. ¶ 14.)  As detailed in the OA, the Members would each make a capital contribution and receive a corresponding Class B Membership Interest in Park 700 Pacific.  (Defs. 56.1 Stmt. ¶ 16.)  Park 700 Pacific was structured to satisfy the four aforementioned conditions set out in Paragraph 25 of the 2013 Contract, such that Shaya Pacific would consent to an assignment of the 2013 Contract from Concord to Park 700 Pacific should Concord propose one.  (See Brodsky Decl. Ex. A ("Jacobov Dep.") at 59:6-17.)  The OA also included a "Drop Dead Date," which was defined as follows:

> **1.24 "Drop Dead Date"**   Shall mean the date that is ninety (90) days from the date this Agreement is fully executed. Notwithstanding anything to the contrary herein, in the event that the Company has not closed on the purchase of the Real Property on or before the Drop Dead Date, then, unless all Members unanimously consent to an extension thereof, the Company shall promptly return the Class B Member's Capital Contributions.

(OA ¶ 1.24.)[4]

---

[4] The parties disagree strongly over the interpretation and impact of the Drop Dead Date, a disagreement that bleeds over from their briefing into their respective statements of supposedly "undisputed" material facts.  (Compare Defs. 56.1 Stmt. ¶¶ 27-28 (stating that the Drop Dead Date was intended to end all fiduciary and contractual obligations) with Pls. 56.1 Stmt. ¶ 17 (stating that the Drop Dead Date only affects the rights of the parties to get back their capital contributions).)  For purposes of this factual background, I merely provide the definition given by the OA.

### E.  The May 2015 Side Letter

At the same time that they executed the OA, Jacobov, Sidman, Vonn Ginn, and Horner signed a side letter agreement (the "Side Letter") to memorialize their understanding of the OA. (Pls. 56.1 Stmt. ¶ 19; Defs. 56.1 Stmt. ¶ 20; see also Sidman Decl. Ex. C ("Side Letter") ("This letter . . . shall serve to memorialize our understanding regarding the execution of [Park 700 Pacific]'s Operating Agreement on this date.").)  The Side Letter detailed that Park 700 Pacific "is expecting to receive an assignment of" the 2013 Contract for the two Units, and that Park 700 Pacific would also be proposed as "the borrower of [FCSB's] financing for [the] acquisition." (Side Letter.)  The Side Letter made clear that FCSB had not yet been notified of the proposed assignment, but that "once the parties to the purchase contract have resolved all open issues relating to the scheduling of a closing, the Lender [(FCSB)] will be notified of the proposed assignment to the Company [(Park 700 Pacific)] . . . ." (Id.; Pls. 56.1 Stmt. ¶ 19.)  The "open issues" that required resolution before assignment of the 2013 Contract and 2015 Loan Commitment would be proposed were: 1) the AG Order restricting Shaya Pacific's ability to sell the Units, and 2) the First Mortgage.  (Pls. 56.1 Stmt. ¶ 19.)

The parties also detailed in the Side Letter how they would proceed if—after the open issues were resolved and assignment was eventually proposed—FCSB took issue with the assignment.  In short, they would try in good faith to accommodate any concerns raised by FCSB, but agreed that if they were unable to do so then the OA and their agreement to assign Concord's rights to Park 700 Pacific would become void.  (Side Letter; Pls. 56.1 Stmt. ¶¶ 20-21.)  Finally, the parties also agreed that Jacobov would be the one to present Park 700 Pacific's OA to FCSB if and when it came time to seek assignment, and that he and his lawyer, David Messer ("Messer"),

would serve as the point of contact between Park 700 Pacific, FCSB, and Shaya Pacific.  (Pls. 56.1 Stmt. ¶ 24.)

F.   The Latter Half of 2015

The "open issues" in the Side Letter remained unresolved into and through the fall of 2015. Thus, on October 1, 2015, the Members of Park 700 Pacific signed a First Amendment to the Operating Agreement (the "First Amendment") to extend the OA's Drop Dead Date to December 31, 2015.  (Id. ¶ 27; Defs. 56.1 Stmt. ¶ 23; see also Sidman Decl. Ex. E.)  When coordinating this extension, Messer advised Plaintiffs and their counsel by email that the Side Letter "would remain in effect and I don't believe any change is needed as it remains valid so long as the parties remain members of the Operating Agreement and in the deal."  (Pls. 56.1 Stmt. ¶ 28.)

By December 2015—the open issues still not resolved and the 2013 Contract still not having closed—Defendant Jacobov advised Plaintiffs that he would not agree to further extension of the Drop Dead Date and took the position that after December 31, 2015, his fiduciary and contractual obligations to Plaintiffs would cease and Plaintiffs' right to participate in the deal would terminate.  (Id. ¶ 30; Defs. 56.1 Stmt. ¶¶ 25, 29.)

G.   Relevant Developments since the Filing of the Present Lawsuit

Plaintiffs commenced this action on December 31, 2015, and filed their Second Amended Complaint ("SAC") on March 17, 2016.  (D.E. # 22 ("SAC")).  Defendants moved to dismiss all claims in the SAC.  (D.E. # 24).[5]  The SAC alleged a total of nine direct claims against Jacobov and/or Concord, including breach of the OA, breach of the Side Letter, breach of the implied

---

[5] Defendants' Rule 56.1 Statement contains many facts from the period after the filing of the present lawsuit, (see Defs. 56.1 Stmt. ¶¶ 30-53), whereas Plaintiffs have included minimal facts from that period, (see Pls. 56.1 Stmt. ¶ 35). As to Defendants' facts from that period, Plaintiffs deny the veracity of many and the relevance of many others.  For completeness, I have limited this section to facts that both parties appear to agree are true, though Plaintiffs do dispute the relevance of some.

covenant of good faith and fair dealing, breach of fiduciary duties, unjust enrichment, and fraud. (SAC at 20-53.)  In an oral ruling on January 27, 2017, Judge Bianco dismissed Plaintiffs' claim against Jacobov for breach of the OA (Count IV) on the grounds that it was derivative rather than direct in nature, while allowing the other eight claims to proceed.  (See D.E. # 38 ("Oral Ruling on MTD").)

While discovery was ongoing, on November 14, 2017 the New York AG and Boymelgreen entered into an Amendment to Assurance of Discontinuance (the "Amended AOD").  (Defs. 56.1 Stmt. ¶ 43.)  The Amended AOD lifted to a limited extent the restrictions previously imposed on Boymelgreen's entity, Shaya Pacific.  (Id. ¶ 44.)  Notably, while the Amended AOD allowed Shaya Pacific to sell the Garage Unit to "a third party purchaser produced and originated by [FCSB]," it mandated that the Retail Unit could not be sold to a third party and could only be sold to non-party Newswalk Condominium Association ("Newswalk").  (Id.)  Thus, the Amended AOD meant that Shaya Pacific could not sell the Retail Unit—one of the two Units that made up the deal—to Concord, Plaintiffs, or any person or entity other than Newswalk.  (Id. ¶ 45.)  One week later, on November 21, 2017, Concord entered into a new agreement (the "2017 Contract") to purchase just the Garage Unit for $5,000,000.  (Id. ¶ 48; Pls. 56.1 Stmt. ¶ 35; see TAC Ex. E ("2017 Contract").)  Defendants did not attempt to assign the 2017 Contract or associated financing arrangement.  (Pls. 56.1 Stmt. ¶ 35.)

At the conclusion of discovery, the parties cross-moved for summary judgment for the first time.  (See D.E. ## 77-95.)  In a written order and for the reasons stated in his oral ruling on March 14, 2019, Judge Bianco dismissed three claims from the SAC on Plaintiffs' concession and granted Defendants' motion for summary judgment on all five remaining claims (Counts I, III, V, VI, and VIII).  (See D.E. # 100; D.E. # 103 ("Oral Ruling on 2019 SJ Mots.").)  Judge Bianco first granted

summary judgment for Defendants on the breach of contract claims (Counts I and III).  Judge Bianco held there was no genuine dispute of material fact that the conditions precedent to Jacobov's obligation to seek assignment—the two "open issues" from the Side Letter, namely, the AG Order and First Mortgage—were not satisfied as of December 2015, which is when the SAC alleged the breach had occurred.  (Oral Ruling on 2019 SJ Mots. at 7-12.)  Judge Bianco incorporated that same reasoning to grant Jacobov summary judgment on the breach of fiduciary duty claim (Count VIII), finding there was no dispute of material fact that Jacobov had not committed any misconduct, given his duty to seek assignment had not arisen.  (Id. at 16-18.)  Finally, Judge Bianco granted Defendants summary judgment on the unjust enrichment claims (Counts V and VI).  (Id. at 12-16.)

> H.  The Present Claims and Motions

In his March 14, 2019 ruling, Judge Bianco declined to address any claims of breach of contract by anticipatory repudiation nor any claims related to Concord's eventual purchase of the Garage Unit in November 2017, because such claims had not been alleged in the Second Amended Complaint.  (Id. at 2-3.)  He did allow Plaintiffs to move to amend and supplement their complaint with those claims.  (Id.)  On April 1, 2020, after the case was reassigned to me and following report and recommendation by the Honorable Steven M. Gold, United States Magistrate Judge, I granted Plaintiffs leave to add the following two claims: 1) anticipatory repudiation against both Defendants based on their conduct in December 2015, and 2) breach of fiduciary duty against Jacobov based on Concord's November 2017 purchase of the Garage Unit.  (D.E. # 116.)

These are the two claims pled by Plaintiffs in the Third Amended Complaint, (see TAC at 11-13), and the subject of the present cross-motions for summary judgment, (see D.E. ## 166-186.)  Plaintiffs move for summary judgment only on the anticipatory repudiation claim.  (See

D.E. # 173 ("Pls. SJ Mem.").)  Defendants move for summary judgment to dismiss both claims. (See D.E. # 171 ("Defs. SJ Mem.").)  In addition, on May 4, 2020, Jacobov filed a Third-Party Complaint against Park 700 Pacific seeking indemnification pursuant to paragraph 11.1 of the OA. (D.E. # 120.)  Jacobov also moves for summary judgment on this indemnification claim.  (Defs. SJ Mem. at 26.)

## LEGAL STANDARDS

Summary judgment is appropriate only if the pleadings and evidence that would be admissible at trial show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 309 (2d Cir. 2008).  The court's function is not to resolve disputed issues of fact but "to determine whether this is a genuine issue for trial." Anderson, 477 U.S. at 249.  No genuine issue exists "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Id.  "If the evidence is merely colorable, . . . or is not significantly probative, . . . summary judgment may be granted." Id. at 249-50 (citations omitted).

The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  In determining whether the moving party has met its burden, the court must "construe the facts in the light most favorable to the non-moving party and . . . resolve all ambiguities and draw all reasonable inferences against the movant." Brod v. Omya, Inc., 653 F.3d 156, 164 (2d Cir. 2011) (internal quotation marks and citation omitted).  Nevertheless, "mere speculation and conjecture is insufficient to preclude the granting" of summary judgment.  Harlen Assocs. v. Incorporated Village of Mineola, 273 F.3d 494, 499 (2d Cir. 2001) (citing W. World Ins. Co. v. Stack Oil, Inc.,

922 F.2d 118, 121 (2d Cir. 1990).  Rather, the non-moving party "must 'set forth specific facts showing that there is a genuine issue for trial.'"  Rubens v. Mason, 527 F.3d 252, 254 (2d Cir. 2008) (quoting Fed. R. Civ. P. 56(e)).

"The same legal standards apply when analyzing cross-motions for summary judgment." Gap Inc. v. Ponte Gadea N.Y. LLC, 524 F. Supp. 3d 224, 230 (S.D.N.Y. 2021).  "[E]ach party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration."  Morales v. Quintel Ent., Inc., 249 F.3d 115, 121 (2d Cir. 2001) (citation omitted).

## DISCUSSION

### I.   The "Open Issues"

Although the parties have briefed numerous issues that they contend resolve the present motions in their favor, one is dispositive: Defendants' argument that a necessary condition set forth in the Side Letter was never met.

### A.   Anticipatory Repudiation

In addressing the anticipatory repudiation claim, I note that the parties agree on certain key points.  First, the parties agree that certain "open issues" had to be resolved to give rise to Defendants' obligation to seek assignment of the 2013 Contract and 2015 Loan Commitment.  (See Side Letter ("We have agreed that once the parties to the purchase contract have resolved all open issues relating to the scheduling of a closing, the Lender will be notified of the proposed assignment . . . .").)  The parties also agree that one of those "open issues" was the AG Order that restricted Boymelgreen from selling the two Units.  (Pls. 56.1 Stmt. ¶ 19; Defs. 56.1 Stmt. ¶ 22.) Judge Bianco previously ruled on summary judgment that the condition precedent posed by the AG Order was not satisfied as of December 2015 nor March 2016, when the original Complaint

and the Second Amended Complaint were filed.  (Oral Ruling on 2019 SJ Mots. at 10-11 (granting in part Defendants' earlier summary judgment motion because "there is no dispute that [in December 2015 or March 2016 the open issues] had not been satisfied and . . . the transaction had not closed due to ongoing issues with the satisfaction of the Doral Bank mortgage and the OAG's consent to the transaction") (internal quotation marks omitted).)

The relevant question on the present motions is whether the conditions precedent were satisfied in November 2017, when Defendants entered into the 2017 Contract to purchase the Garage Unit.[6]   At that time, Boymelgreen had recently entered into the Amended AOD with the New York AG.  That Amended AOD allowed Boymelgreen to sell only one of the Units—the Garage Unit—but required that the Retail Unit be sold to non-party Newswalk.  Plaintiffs' position is that the parties contemplated that such a change might occur, that the Amended AOD satisfied the condition precedent to Defendants' performance, and that Defendants were obliged to assign the 2017 Contract despite the fact that it was a new contract for only the Garage Unit.  Defendants' position is that the parties clearly contemplated only the combined sale of both Units, and entry of the Amended AOD meant that such a transaction (the 2013 Contract) could never take place.  As

---

[6] In previously granting Plaintiffs leave to amend their complaint, I accepted as true their allegation that the "open issues impeding closing . . . [had] been resolved" by November 2017.  (See D.E. # 116 at 5 (citing TAC ¶¶ 45-47).)  However, that was under a standard that required me to "'accept the facts in the proposed amended complaint as true'" and to "deem[] true and present[] [the facts as alleged in the TAC] in the light most favorable to Plaintiffs.  (Id. at 2 (citations omitted).)  Accordingly, in opposing the amendment, Defendants had not contested the proposed TAC's allegations—they focused instead on the relevant considerations of prejudice, bad faith, and futility that courts consider in deciding whether to allow an amendment, while still making clear that they disagreed that Plaintiffs had any right to participate in the 2017 deal.  (See, e.g., D.E. # 106 at 12 (arguing that Plaintiffs have "concocted a new, albeit equally bogus theory of recovery based on Concord's acquisition of the Garage Unit in 2017").)  After I granted leave to amend, Defendants filed their Answer and denied Plaintiffs' allegations that the "open issues" were resolved in November 2017.  (See D.E. # 119 ¶¶ 45-47.)  Now, on summary judgment and with the full evidentiary record at their disposal—which includes documents Plaintiffs did not include as exhibits to the TAC (such as the 2015 Loan Commitment) as well as the parties' Rule 56.1 Statements (which are themselves supported by record evidence and affidavits)—Defendants argue that there is no genuine dispute that the condition precedent posed by the AG Order was not resolved in November 2017 in a manner that required assignment.  As discussed herein, I agree.

a legal matter, Defendants offer two related arguments why this warrants dismissing Plaintiffs' anticipatory repudiation claim: 1) the Amended AOD meant that the condition precedent, or "open issue," was not satisfied in a way that would allow closing on the 2013 Contract, and 2) the Amended AOD rendered it impossible for Defendants to satisfy their alleged obligations to Plaintiffs.[7]  (Defs. SJ Mem. at 15-18.)  I agree with Defendants' first argument.[8]

Summary judgment should be granted in favor of a defendant accused of breach of contract where the defendant's contractual obligations were subject to an unsatisfied condition precedent. See Mullinix v. Mount Sinai Sch. of Med., No. 12-cv-8659 (PKC), 2015 WL 328050, at *4 (S.D.N.Y. Jan 23, 2015); Pober v. Columbia 160 Apartments Corp., 697 N.Y.S.2d 619, 620 (App. Div. 1999).  Separately, if performance of a contract is rendered impracticable or impossible, a party's obligation to perform can be discharged:

> Where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary.

---

[7] Plaintiffs briefly argue in footnotes that I should not consider certain of Defendants' affirmative defenses because they were not pled in Defendants' Answer to the TAC.  (See, e.g., D.E. # 177 ("Pls. Opp'n") at 2 n.2.)  A "court may . . . entertain [unpleaded] affirmative defenses at the summary judgment stage in the absence of undue prejudice to the plaintiff, bad faith or dilatory motive on the part of the defendant, futility, or undue delay of the proceedings." Rose v. AmSouth Bank of Fla., 391 F.3d 63, 65 (2d Cir. 2004) (alterations in original) (internal quotation marks omitted).  Plaintiffs offer no argument or evidence in support of there being any undue prejudice, bad faith, dilatory motive, or futility posed by considering Defendants' arguments; they simply point out that the litigation is long-running and that Defendants did not include the defenses in a prior motion to amend.  In the absence of any convincing argument or evidence of undue prejudice, delay, or bad faith, I consider it entirely appropriate to consider these defenses, particularly given that the AG Order has long been a central issue in this case.  It should come as no surprise to Plaintiffs that it remains a central issue on these summary judgment motions.

[8] Because I hold that the condition precedent posed by the AG Order was never satisfied, I need not decide whether Defendants' impossibility argument provides an independent ground for dismissing the anticipatory repudiation claim.

<u>Serdarevic v. Centex Homes, LLC</u>, No. 08-cv-5563 (VB), 2012 WL 4054161, at *14 (S.D.N.Y. Sept. 5, 2012) (quoting Restatement (Second) of Contracts § 261), <u>adhered to on reconsideration</u>, 2012 WL 5992744, at *2 (Nov. 7, 2012).  Further:

> A party's duty to pay damages for total breach by repudiation is discharged if it appears after the breach that the duty that he repudiated would have been discharged by impracticability or frustration before any breach by non-performance.

<u>Serdarevic</u>, 2012 WL 4054161, at *14 (quoting Restatement (Second) of Contracts § 254).

One wrinkle to the present case is that the claim in the TAC is not a claim of traditional contractual breach—it is a claim of anticipatory repudiation.  There is no dispute that Jacobov repudiated the contract in December 2015, although there is a dispute as to whether the passage of the Drop Dead Date in the Operating Agreement justified that repudiation.  But even assuming <u>arguendo</u> that the December 2015 repudiation did constitute a breach, that breach may still be excused if the circumstances were later rendered such that the parties could not have fulfilled their obligations in any event.  <u>See</u> <u>Pesa v. Yoma Dev. Grp., Inc.</u>, 965 N.E.2d 228, 230 (N.Y. 2012) ("It is axiomatic that damages for breach of contract are not recoverable where they were not actually caused by the breach—i.e., where the transaction would have failed, and the damage would have been suffered, even if no breach occurred.").  That is because in order to recover for anticipatory breach, a plaintiff must show it was "ready, willing, and able to perform its own obligations under the contract when performance was due."  <u>Towers Charter & Marine Corp. v. Cadillac Ins. Co.</u>, 894 F.2d 516, 523 (2d Cir. 1990) (citing <u>Huntington Mining Holdings, Inc. v. Cottontail Plaza, Inc.</u>, 459 N.E.2d 492, 492 (N.Y. 1983) (mem.)); <u>see also</u> <u>Wansdown Props. Corp. N.V. v. 29 Beekman Corp.</u>, 620 B.R. 487, 503 (Bankr. S.D.N.Y. 2020) ("In order to recover damages, the [non-breaching party] must prove that it was ready, willing and able to perform [at the time for performance]." (citations omitted)).  But "[p]erformance of a duty subject to a condition cannot

become due unless the condition occurs or its non-occurrence is excused."  Restatement (Second) of Contracts § 225(1); see also Serdarevic, 2012 WL 5992744, at *2 (holding that the performance of a defendant who had earlier repudiated a contract was "nonetheless excused because the town's zoning law caused a failure of a condition precedent to closure"); Wansdown Props., 620 B.R. at 503.  Thus, if some condition precedent fails even after repudiation, then performance never became or would have become due, and Plaintiffs are not entitled to recover damages.

The Serdarevic case is highly persuasive.  That case also concerned the interplay of conditions precedent and a party's repudiation of a property purchase agreement.  In Serdarevic, the defendant Centex argued that its obligation to purchase one of the properties at issue had been discharged because a town's 2009 zoning amendments made it impossible to obtain government approvals that were required conditions precedent to closing.  2012 WL 4054161, at *9.  The plaintiff Serdarevic did not dispute that the 2009 zoning amendments rendered that property undevelopable as contemplated by the agreements; rather, Serdarevic argued that Centex had anticipatorily repudiated the purchase agreement long before 2009.  Id. at *14.  The Serdarevic court granted summary judgment for Centex.  Id. at *21.  In its initial ruling, the court agreed that Centex had repudiated the contracts, but nevertheless granted summary judgment for Centex because "that repudiation is immaterial because performance under the agreements was ultimately rendered impossible."  Id. at *14.  On a motion for reconsideration, the court affirmed its decision but modified its reasoning.  Serdarevic, 2012 WL 5992744, at *2.  The court disavowed the impossibility basis for its decision because Centex had not proven a separate element of the impossibility defense that required it to show any change in zoning laws could not have been foreseen at the time of contracting.  Id.  But the court still granted summary judgment in favor of

Centex, holding that "Defendant's performance, however, is nonetheless excused because the town's zoning law caused a failure of a condition precedent to closure." Id.

So too here: even if Defendants' repudiation in December 2015 constituted a breach, an issue I need not decide, Defendants' performance "is nonetheless excused because the [Amended AOD] caused a failure of a condition precedent." Id. Plaintiffs argue that in November 2017 the Amended AOD satisfied the condition precedent posed by the AG Order, but offer little support for that position outside of a citation to Paragraph 44 of Defendants' 56.1 Statement, which they argue constitutes an admission by Defendants that the condition was satisfied. (See Pls. Opp'n at 3.) Plaintiffs distort Defendants' position. Defendants' position is that the condition failed because the Amended AOD only lifted the restrictions on Boymelgreen "for the limited purpose" of selling the Garage Unit, but precluded the Retail Unit from being included in the deal. (See Defs. 56.1 Stmt. ¶ 44.) Indeed, Defendants' first legal argument in their memorandum is that the condition precedent was never satisfied because "the 2017 Amended AOD required Shaya B to sell the Retail Unit—a material component of the 2013 Contract of Sale—to [Newswalk]" and as such "the 'open issues' referenced in the Side Letter were never resolved in a way that would allow either Concord or Park 700 to acquire the Garage Unit and Retail Unit as contemplated by the 2013 Contract of Sale and Side Letter." (Defs. SJ Mem. at 16.)

The parties' written agreements overwhelmingly support Defendants' position. It is true that the single line from the Side Letter that establishes the condition precedent is not explicit in defining what the parties intended would be necessary to "resolve[]" the condition. (See Side Letter (stating that "once the parties to the purchase contract have resolved all open issues relating to the scheduling of a closing, the Lender will be notified of the proposed assignment").) But the rest of their written agreements clearly indicate that the parties intended that the condition would

need to be resolved in a manner that allowed the sale of both Units. "'A contract should be read as a whole, with every part interpreted with reference to the whole; if possible, the contract will be interpreted so as to give effect to its general purpose.'" Kaplan v. Kaplan, 106 N.Y.S.3d 102, 105 (App. Div. 2019) (citations omitted).  Furthermore, "[w]hen multiple contracts are at issue, 'all writings which form part of a single transaction and are designed to effectuate the same purpose must be read together, even [if] they were executed on different dates and were not all between the same parties.'"  JN Contemp. Art LLC v. Phillips Auctioneers LLC, 507 F. Supp. 3d 490, 500 (S.D.N.Y. 2020) (alteration in original) (quoting TVT Records v. Island Def Jam Music Grp., 412 F.3d 82, 89 (2d Cir. 2005)), aff'd, 29 F.4th 118 (2d Cir. 2022).  Here, the purpose of the parties' agreement—as manifested through the Side Letter itself, and together with the OA, the 2013 Contract, and the 2015 Loan Commitment—was to receive assignments that would allow Park 700 Pacific to purchase both the Garage Unit and Retail Unit.  Likewise, the resolution of the AG Order that the parties contemplated was one which would allow the purchase of both Units to go forward, not just one or the other.  Because the Amended AOD meant this would never happen, the condition precedent had failed.  Thus, Defendants' obligation to seek assignment of the 2013 Contract and the 2015 Loan Commitment never arose, and there is nothing in the agreements to suggest that Defendants should still have been required to seek assignment of the completely different 2017 Contract for only the Garage Unit at $5,000,000.

I begin with the Side Letter, which states in its opening paragraph:

As all Members are aware, the Company is expecting to receive an assignment of the purchase contract (which is to be revised to state a higher purchase price based on which financing has been obtained, among other changes) for the acquisition of the commercial condominiums Unit #2 and Unit #100 on Pacific Street, Brooklyn, New York (the "**Real Property**") from the current purchaser at or prior to the closing of this transaction.

(Side Letter (emphasis in original).)  The parties' intent is already manifest from this passage.  The Side Letter defines the two Units collectively as the "Real Property" and then refers throughout the letter to this collective term, never referencing either Unit on its own or setting out any terms that apply to only one or the other.  (Id.)  The Side Letter also makes clear that the contractual obligations set forth therein relate to a specific purchase contract that was already in existence at this time in May 2015: "the purchase contract . . . for the acquisition of the commercial condominiums Unit #2 and Unit #100."  (Id.)  This is a clear reference to the 2013 Contract to purchase both Units, and the Side Letter consistently reiterates that the obligations relate to that specific contract, including in the very line that sets forth the conditions precedent.  (Id. ("[O]nce the parties to the purchase contract have resolved all open issues . . . .").)  The Side Letter also contemplated the assignment of the financing that Jacobov had obtained.  (See id. ("If, for any reason, the Lender has any objection to the Company owning the Real Property and becoming the borrower of their financing for its acquisition . . . .").)  This, too, was reference to a specific financing for the purchase of both Units, namely, the 2015 Loan Commitment.  (Id. ("You are all aware that I have obtained a financing commitment from [FCSB] for the acquisition of the Real Property . . . .").)  Thus, when "read as a whole, with every part interpreted with reference to the whole," Kaplan, 106 N.Y.S.3d at 105, the Side Letter evinces that the parties' intent was to assign the 2013 Contract and 2015 Loan Commitment once the "open issues" were resolved in a way that would allow them to do so.  Naturally, that would require the AG Order to be lifted such that the two Units that formed the basis of those agreements could be part of the deal.

This understanding is only reinforced when read in conjunction with the other writings that formed the basis of the parties' business relationship.  The Park 700 Pacific OA is particularly telling, given that the Side Letter's explicit purpose was to "memorialize [the parties']

understanding regarding the execution of [the] Operating Agreement." (Side Letter.) Like the Side Letter, the OA defined the term "Real Property" as "the commercial condominium units identified as Unit 2 (the Garage Unit) and Unit 100 (the Store Unit) located at 700 Pacific Street, Brooklyn[,] New York." (OA ¶ 1.44.) The OA then refers to the Units jointly as the "Real Property" a total of 16 times, and never individually. Importantly, various other provisions within the OA themselves hinge upon this collective term. (See, e.g., OA ¶ 1.9 (commencing preferential return on Class B Members' capital on "the closing date on which the Real Property is purchased").) And particularly telling is how the parties defined the company's purpose:

> **2.5 Purpose of Company.** The Company has been formed to acquire, own and manage the Real Property and for any lawful business purpose. Upon acquisition of the Real Property, the Company shall pay to or for the benefit of any Member all of the Real Property Acquisition Costs.

(OA ¶ 2.5.) The two operative agreements consistently reflect that the parties entered those agreements with the express purpose of acquiring the Retail Unit and Garage Unit together.

This is unsurprising in light of the 2013 Contract and 2015 Loan Commitment, the two agreements that the parties' contemplated would be assigned to Park 700 Pacific. The 2013 Contract likewise defined the two Units together as the "Units," set a single total price for the Units, specified that the Units were encumbered by a single first mortgage lien held by Doral Bank, and specified that FCSB held a security interest which required its consent for a transfer of the two Units. (2013 Contract.) The 2015 Loan Commitment, which contemplated a first- and second-mortgage loan, was specifically written "to finance the acquisition of property described in Paragraph F." (2015 Loan Commitment.) Paragraph F required that the first-mortgage loan "must be secured by . . . a first mortgage on condominium Unit No. 2 . . . and on condominium Unit 100," and that the second-mortgage loan "must be secured by . . . a second mortgage on Units 2 and 100." (Id.) Although Plaintiffs were not party to these agreements, they entered the business

relationship for the purpose of receiving assignment of those agreements.  "[A]ll writings which form part of a single transaction and are designed to effectuate the same purpose must be read together, even [if] they were executed on different dates and were not all between the same parties."  <u>JN Contemp. Art LLC</u>, 507 F. Supp. 3d at 500 (alterations in original).  When read in conjunction with the parties' Side Letter and OA, these documents further reinforce that the parties' expectation was to consummate a deal for both the Garage Unit and Retail Unit.

 Confronted with the clear intent evinced by the face of these documents, Plaintiffs point to a single parenthetical clause from the Side Letter:

> As all Members are aware, the Company is expecting to receive an assignment of the purchase contract (<u>which is to be revised to state a higher purchase price based on which financing has been obtained, among other changes</u>) for the acquisition of the commercial condominiums Unit #2 and Unit #100 on Pacific Street, Brooklyn, New York (the "**Real Property**") from the current purchaser at or prior to the closing of this transaction."

(Side Letter (first emphasis added).)  Plaintiffs argue that the parenthetical language from this passage indicates "the parties knew at the time they signed the Side Letter that Defendant Concord was going to be assigning a contract with different terms than the 2013 Contract."  (Pls. Opp'n at 3.)  But while it is true that the parties anticipated some different terms, those were not just any terms.  Rather, the evidence supports that the referenced changes were ones that the parties were already aware of at the time they signed the Side Letter, and there is no evidence whatsoever that the parties contemplated completely eliminating one of the two Units.  Between the signing of the 2013 Contract and the signing of the Side Letter in May 2015, Jacobov had received the 2015 Loan Commitment from FCSB.  The 2015 Loan Commitment provided financing for the purchase of the two Units at a price higher than what Concord had originally agreed to.  Accordingly, when the parties signed the Side Letter, they were aware that the 2013 Contract would be amended to reflect this higher price and financing, and they acknowledged as much in the letter's parenthetical

language.  Plaintiffs themselves acknowledge this in their own 56.1 Statement.  (See Pls. 56.1

Stmt. ¶ 9 ("In January 2015, FCSB, Shaya Pacific, and Concord (through Jacobov) began

finalizing their negotiations for the FCSB to issue a loan commitment to Concord Arena to fund

its closing on the 2013 Contract at an increased purchase price of $4,325,000.00.").)

The chosen language itself—that the 2013 Contract "is" to be revised to reflect a higher

price on which financing "has been obtained"—further cements that the contemplated changes

were ones of which the parties were already aware.  To the extent it is Plaintiffs' argument that the

clause "among other changes" was intended to cover any other potential change to the 2013

Contract, they ascribe these three words far more weight than they can bear.  First, the very

language surrounding the parenthetical defines the purchase contract in terms of the two Units:

"the purchase contract . . . for the acquisition of the commercial condominium Unit #2 and Unit

#100."  Second, the "among other changes" clause is better read as supplementing the language

that precedes it, accounting for any ancillary changes that might accompany updating the 2013

Contract to properly reflect the new purchase price and financing.  Third and ultimately fatal to

Plaintiffs' argument is that the parenthetical language only covers potential changes to the 2013

Contract—not the 2015 Loan Commitment.  The parties planned to assign to Park 700 Pacific not

just the 2013 Contract, but also the 2015 Loan Commitment.  (See Side Letter ("If, for any reason,

the Lender has any objection to the Company owning the Real Property and becoming the

borrower of their financing for its acquisition . . . .").)  As already discussed, that 2015 Loan

Commitment was specifically written to finance the purchase of both Units.  Thus, any change to

eliminate one of the two Units from the deal would necessarily involve a change to both the 2013

Contract and the 2015 Loan Commitment.  But the Side Letter's parenthetical language only

contemplates changes to the purchase contract.  Plaintiffs' reading of this parenthetical clause is belied by the written agreements and must be rejected.

To summarize: there is no genuine dispute of material fact that the parties agreed to a conditional contractual right for assignment of the 2013 Contract to acquire both Units, and one key condition never came to fruition due to the Amended AOD.[9]  Thus, regardless of how Defendants' December 2015 repudiation is interpreted, Defendants' performance "is nonetheless excused because the [Amended AOD] caused a failure of a condition precedent."  Serdarevic, 2012 WL 5992744, at *2.  Therefore, I deny Plaintiffs' motion for summary judgment on the claim of anticipatory repudiation and grant Defendants' summary judgment motion to dismiss the claim.

B. Breach of Fiduciary Duty

Plaintiffs' remaining claim is that Jacobov breached his fiduciary duties to Plaintiffs by closing on the 2017 Contract for just the Garage Unit without the involvement of Park 700 Pacific.  Jacobov moves for summary judgment to dismiss the claim.  For many of the same reasons already discussed, I conclude that Jacobov is also entitled to summary judgment on this claim.

"In order to sustain a claim of breach of fiduciary duty under New York law, [plaintiffs] must prove the existence of a fiduciary relationship, misconduct by [defendants], and damages directly caused by [defendants'] misconduct."  Neogenix Oncology, Inc. v. Gordon, 133 F. Supp. 3d 539, 553-54 (E.D.N.Y. 2015) (alteration in original) (quoting Margrabe v. Sexter & Warmflash,

---

[9] Plaintiffs' counsel briefly suggested at oral argument that the Garage Unit was the central focus of the parties' agreement, implying the Retail Unit was immaterial to the deal.  "Terms relating to the subject matter, parties, and price are essential and material to a contract for the sale of real property."  91 N.Y. Jur. 2d Real Property Sales and Exchanges § 16.  While it may have been true that the Garage Unit was the more valuable of the two Units, Plaintiffs have pointed to no evidence to support that the Retail Unit—an 850 square-foot commercial space in a busy area of Brooklyn—was immaterial to the deal.  As already discussed at length, the parties' written agreements evince quite the opposite, consistently lumping the two Units together and treating them as the same.  Thus, Plaintiffs argument— to the extent they are even pressing such an argument—is rejected.

P.C., 353 F. App'x 547, 549 (2d Cir. 2009) (summary order)). Here, Plaintiffs' claim is that Jacobov breached a duty owed to Park 700 Pacific and its members when he acted in bad faith to usurp for himself an opportunity that should have been the company's by entering into the 2017 Contract to purchase the Garage Unit.[10] (Pls. Opp'n at 6 ("Plaintiffs [sic] second claim is for breach of fiduciary duty based on Defendant Jacobov's bad faith diversion of the parking lot opportunity for himself, rendering worthless their interests in Park 700 Pacific.").)

Jacobov committed no "misconduct" that constitutes a breach of fiduciary duty. See Neogenix Oncology, 133 F. Supp. 3d at 553. Likewise, there are no "damages directly caused by" any such misconduct, id., and there were no actions taken by Jacobov that approached bad faith. As already discussed at length, the parties in this case defined their relationship extensively in written agreements. Any fiduciary duties Jacobov may have owed to Plaintiffs stemmed from his role as Manager (along with Sidman) of Park 700 Pacific, which the parties formed for an explicit purpose: to "acquire, own and manage the Real Property," defined as the Retail Unit and Garage Unit. (OA ¶ 2.5.) There is no allegation that Jacobov's role as Manager of Park 700 Pacific meant he owed Plaintiffs some broad-ranging fiduciary duties beyond the context of the specific conditional duty, defined in the Side Letter, to seek the assignments that the parties anticipated. Indeed, the parties signed the Side Letter to "memorialize [their] understanding regarding the

---

[10] Plaintiffs' fiduciary breach claim is properly limited to Jacobov's November 2017 conduct. The TAC and Plaintiffs' opposition papers at times suggest that earlier actions of Jacobov's should also be considered. (See TAC ¶ 58 (alleging that "Jacobov breached his fiduciary duties to Plaintiffs, including through his conduct in December 2015 and November 2017"); see also Pls. Opp'n at 10.) When I granted leave for Plaintiffs to amend their complaint, I permitted them to add a fiduciary breach claim that was specifically limited to Jacobov's November 2017 conduct. (See D.E. # 116 at 7.) In addition, Judge Bianco granted summary judgment dismissing Plaintiffs' previous claim of fiduciary breach against Jacobov based on his December 2015 actions, concluding there was no genuine dispute of material fact that Jacobov had not committed a breach of fiduciary duties at that time, given that the conditions precedent to his duty to seek assignment had not been satisfied. (Oral Ruling on 2019 SJ Mots. at 16-18 (denying fiduciary breach claim by incorporating reasoning from denial of breach of contract claim).) Plaintiffs' attempts to incorporate Jacobov's pre-November 2017 actions into this claim are therefore rejected.

execution of the Company's Operating Agreement," (Side Letter), and Plaintiff's TAC alleges that the fiduciary duties Jacobov owed to Plaintiffs as Manager of Park 700 Pacific were "further informed by Defendants' obligations to Plaintiffs under the Side Letter." (TAC ¶ 57.) That Side Letter explicitly contemplated assignment of the 2013 Contract to purchase both Units, and defined the extent of Jacobov's duty to seek assignment. Importantly, that duty was conditioned on the open issues being resolved. After one of those conditions failed, Jacobov did not breach any duty to Plaintiffs by entering into a new agreement for the Garage Unit.

In sum, for much the same reason as has already been discussed at length, there is no genuine dispute of material fact that Jacobov had no duty to propose that Park 700 Pacific be assigned the 2017 Contract for only the Garage Unit. As a result, summary judgment is granted for Jacobov and Plaintiffs' claim for breach of fiduciary duty is dismissed.

## II. Indemnification

Defendant Jacobov filed a third-party indemnity complaint against Park 700 Pacific, (see D.E. # 120), based on Paragraph 11.1 of the OA, which states in part that:

> The Company shall indemnify the Manager(s) and any other Person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding by reason of the fact that he or she is or was a Manager, Member, officer, employee or other agent of the Company . . . .

(OA ¶ 11.1.) Having found Jacobov is not liable to Plaintiffs, there is no basis to indemnify Jacobov for "any judgment entered against Jacobov in this litigation." (See D.E. # 120 at 3.) Jacobov has also asked to be indemnified for "legal fees and costs incurred . . . in defending this litigation." (Id.) The general rule under New York law is that "'attorney's fees are incidents of litigation and a prevailing party may not collect them from the loser unless an award is authorized by agreement between the parties, statute or court rule.'" Abakan, Inc. v. Uptick Cap., LLC, 943 F. Supp. 2d 410, 415 (S.D.N.Y. 2013) (quoting Hooper Assocs., Ltd. v. AGS Computers, Inc., 548

N.E.2d 903, 904 (N.Y. 1989)).  "Promises to indemnify 'must be strictly construed to avoid reading into it a duty which the parties did not intend to be assumed' . . . because 'the general American rule requires parties to bear their own litigation expenses.'"  Id. (quoting Happy Kids, Inc. v. Glasgow, No. 01-cv-6434 (GEL), 2002 WL 72937, at *2 (S.D.N.Y. Jan. 17, 2002) (noting that a promise by one party to indemnify the other for litigation expenses in an action between them is "exceptional")).  In addition, "'[w]here a general indemnification provision does not explicitly provide for indemnification for suits between the parties to the contract, a claim for such indemnification must fail.'"  Id. (quoting GEM Advisors, Inc. v. Corporacion Sidenor, S.A., 667 F. Supp. 2d 308, 329 (S.D.N.Y. 2009)); see also In re Refco Sec. Litig., 890 F. Supp. 2d 332, 343 (S.D.N.Y. 2012) ("A provision containing only broad language that does not unequivocally indicate that the parties intended to indemnify attorneys' fees in lawsuits between themselves will ordinarily not support a claim for indemnity in suits between the parties.").  Here, the indemnity clause does not evince an unmistakably clear intent of the parties to indemnify one another in suits amongst themselves, particularly where the nature of Plaintiffs' allegations was that Jacobov acted in an individual capacity in dereliction of his role as Manager.  Thus, as is the "general American rule," both parties will bear their own litigation expenses.  Happy Kids, 2002 WL 72937, at *2. Because I hold that Jacobov is not entitled to indemnification as a matter of law, his third-party complaint is dismissed.

## CONCLUSION

For the reasons stated above, Plaintiffs' motion for partial summary judgment is DENIED and Defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART. Defendants' summary judgment motion is granted to the extent it seeks dismissal of Plaintiffs' two claims from the Third Amended Complaint; Defendant Jacobov's motion for summary judgment seeking indemnification is DENIED.

SO ORDERED.

Dated: March 17, 2023
        Brooklyn, New York

s/Carol Bagley Amon

Carol Bagley/Amon
United States District Judge